# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

**Civil Action No. 95-cv-00777-ZLW-OES**

**In re:**

**Receivership Estate of INDIAN MOTORCYCLE MANUFACTURING, INC.,
a New Mexico Corporation**

_____

### UNITED STATES' POSITION WITH RESPECT TO PAYNE'S OBJECTION (DI# 2048, 2049, 2050) TO MAGISTRATE JUDGE'S RECOMMENDATION TO GRANT RECEIVER'S MOTION FOR RESTITUTION
_____

The United States submits this response to Michael Payne's objection (filed originally as DI# 2048 and again as DI# 2050), pursuant to Fed.R.Civ.P. 72, to the Magistrate Judge's report and recommendation that the Court grant the Receiver's motion for restitution, and to Payne's related motion for leave to submit testimony (DI# 2049).[1]  In a few limited respects, the United States concurs in some of Payne's points with respect to the language of proposed restitution order that accompanies the Magistrate Judge's report and recommendation, and suggests modifications to address the issues raised.[2]

### Factual Errors

1.  Payne states (on page 3) that the receivership estate incurred tax based on the Receiver's receipt of IMCOA stock in the sale of assets and that, "in June 2000, the Internal Revenue Service

---

[1]  While the United States maintains that, under its settlement agreement with the Receiver, it is the Receiver's primary task to prosecute its motion for restitution, the United States has reserved the right to reply to defenses asserted by distributees where those defenses directly implicate the interests of the United States.  The United States previously replied to Michael Payne's original opposition to the Receiver's motion for restitution.

[2]  The United States has been circulating a proposed order that would modify service requirements consistent with a bench ruling by Magistrate Judge Schlatter and, consistent with that ruling, is limiting Rule 5 service of this reply to those who have registered to receive service via the Court's ECF system (which includes counsel for Mr. Payne).

(the 'IRS') estimated that the receivership estate owed $4 million in income taxes for the tax year 1999 based on this capital gain," and cites in support of this assertion, United States v. Sterling Consulting Corp., 289 B.R. 269, 284-85 (B.A.P. 1st Cir. 2003).  The citation does not support the statement and the statement is factually incorrect.  The decision refers to an estimated claim for tax incurred by the *bankruptcy estates* in Massachusetts, not by the *receivership* estate, and the $4 million tax estimate is not based on the Receiver's receipt of IMCOA stock.  The IRS never estimated a tax of $4 million for the receivership entity (IMMI).  More importantly, as of June 2000, the IRS audit of IMMI's 1999 corporate income tax return had barely gotten underway and there was as yet no estimate whatsoever as to what the tax, if any, might be.

The relevance to the receivership estate of the IRS's mid-2000 estimation of a $4 million tax for the *bankruptcy estates* is that, after that estimate, the Receiver could no longer rely on receiving about $450,000 in cash it originally hoped to receive based on a pre-petition claim it had filed in the bankruptcy cases.  But the distributions on claims filed in this receivership case had already been completed by January of 2000.[3]

_____

[3]  The United States does maintain that the Receiver erred in thereafter (after mid-2000) using additional funds it received from IMCOA or the new Indian Motorcycle Company under the assets-sale agreement to satisfy other administrative expenses (including compensation for the Receiver and the Receiver's counsel), and that this increases the potential exposure of the Receiver and its counsel to liability if at least $350,000 is not received by the IRS under the "Side Agreement" (attached as an exhibit to Payne's Rule 72 objection).  The Receiver has counter-arguments as well, stemming partly from the fact that, under the asset-sale agreement, the purchaser (IMCOA or a related company) was required to pay funds to compensate the Receiver and its counsel.  The Receiver maintains it therefore was not required to reserve those funds to pay the tax.  That issue is not presently before the Court (and the Receiver's potential liability under 31 U.S.C. § 3713(b) is beyond the jurisdiction of this case).  But none of this aids Payne's cause for the following reason.  Assuming that the IRS is correct in maintaining that funds made available by the purchaser after June 2000 should have been reserved for any potential tax claim, at least once the Receiver knew an IRS audit was underway, that would only have increased the unpaid claims of the Receiver and its counsel.  And, those claims would have had priority over the pre-receivership claims such as that of Payne, regardless of any dispute between the Receiver and the IRS as to whether their respective administrative claims are senior, junior, or share equal priority.

Payne's mistake in confusing the bankruptcy and receivership tax issues is repeated in a somewhat different and potentially more prejudicial assertion, found in his argument section (p.25), that this Court's January 20, 2000 order overruled an IRS objection to the "Distribution Orders" based on the Trustee's distribution to the Receiver, which the IRS (according to Payne) failed to appeal, implying that the IRS thereby waived any other objections.  The government did not object in any way to the receivership Distribution Orders, and was not even a party to this case at the time.  In January 1999 the Receiver and the United States filed a Stipulation "withdrawing" the pleading on which the IRS had intervened in 1997 (to collect Michael Mandelman's tax from a distribution proposed to Michele Lean).  The withdrawal of the government's pleading against Ms. Lean was made possible because the January 1999 Stipulation also agreed that the Receiver would comply with an *administrative* levy recently served on it by the IRS for Mandelman's distribution, which, with the asset-sale imminent, would be clearly sufficient to fully satisfy his taxes, thus making the dispute over the distribution to Ms. Lean moot.  Even assuming the IRS was still a "party" in the wake of the withdrawal Stipulation, it was a party only with respect to the taxes owed by Mr. Mandelman.

What the January 20, 2000 Order overruled was the IRS's opposition, on jurisdictional grounds, to the Receiver's motion to have this Court determine the *bankruptcy estate's* taxes.  And the IRS did appeal that order – first to the District Judge (who adopted it on March 20, 2000), and then to the Tenth Circuit (after it was certified for interlocutory appeal under 28 U.S.C. § 1292(b)). The Tenth Circuit reversed.  United States v. Sterling Consulting Corp., 245 F.3d 1161 (10th Cir. 2001).  In the same opinion, the Tenth Circuit reversed a separate subsequent order of this Court asserting jurisdiction to determine that IMMI owed no tax unless the IRS asserted a claim by a deadline earlier than the expiration of its statutory time to make an assessment.  It is clear from the opinion that no tax had yet been asserted or even estimated for IMMI at the time this Court issued

the orders on appeal.[4]

2. On page 4, Payne states that the IMCOA stock "forms the basis of the tax liability in question here."  While this time he has the right entity, the statement is not accurate.  There were four major substantive tax issues involved in the receivership tax litigation.  One of them involved the Receiver's deduction of an assertedly accrued obligation to distribute 2.25 million shares of IMCOA stock received in the assets sale.  For reasons indicated in the June 6, 2003 opinion of the Massachusetts District Court, the deduction was ruled to be improper.  That issue accounts for roughly $400,000 of the tax principal of $1,052,000.[5]

3. Payne also complains that he does not know why the Receiver sold 400,000 of the IMCOA shares to defray litigation expenses, and yet did not sell the remainder.  The record in this case, however, reflects that the Receiver sought this Court's approval to sell 400,000 shares (with an option to repurchase) and that the Receiver retained the remaining shares because of prior orders approved by this Court that required the Receiver to distribute the stock to certain administrative claimants (holders of receivers certificates) who had originally been promised stock in IMMI at a time when it was believed that IMMI was going to be revived as the entity to build

---

[4] It is true that the IRS also objected to the Trustee's distribution to the Receiver but that objection was asserted in the Massachusetts bankruptcy court in response to a motion filed by the Trustee.  The IRS objected partly because the proposal included a determination to cede jurisdiction over the bankruptcy tax issues to this Court.   The bankruptcy court overruled that objection and the IRS appealed to the First Circuit BAP, which reversed.  In re Indian Motocycle Co., 261 B.R. 800 (B.A.P. 1st Cir. 2001).  The parties have previously referred to that 2001 decision as "BAP 1," and have referred to the 2003 decision cited by Payne as "BAP 2."

[5] Paragraph 7 of the Magistrate Judge's proposed judgment is incorrect in stating that the tax was resolved at $1.5 million without including any interest.  The Rule 54(b) judgment is for the sum of $1,065,270 plus $358,351.84 in interest through September 30, 2003, plus interest thereafter at federal tax underpayment rates, for the year ended 9/30/99 (plus a small additional amount for the short year ended 11/8/99 for which filed a final tax return for IMMI after its dissolution).  With over two years of additional interest, the amount is now over $1.6 million.

motorcycles.[6]  Additionally, the Receiver's Thirtieth Report, filed with this Court only days after the January 2000 order approving the last distribution to Payne, stated that the dispute which had already begun over the taxes of the bankruptcy estates was causing the Receiver to worry about a similar dispute possibly arising over IMMI's taxes, and added that "the receiver may not be able to distribute the remainder of the Purchase Money Common Stock until the issue has been finally resolved."  (DI# 1300 at ¶ 18-b, pp.7-8.)  If Payne thought the possibility of a tax claim called for immediate liquidation of the rest of the purchase money stock, he did not make that viewpoint known to anyone at that time.

4.  On page 5, Payne inaccurately depicts the Side Agreement where he states that the IRS's receipt of at least $350,000 will release the Receiver from personal liability for IMMI's tax as well as liability for "$93,000 in interest allegedly diverted from the Receivership estate."  The $93,000 refers to interest earned not on receivership estate funds but rather on the $1.2 million held in escrow that was derived from the bankruptcy estate and later held by the Bankruptcy Court (on remand from the BAP 1 decision) to have been property of the *bankruptcy estates.*  See In re Indian Motocycle Mfg. Co., Inc., 266 B.R. 243 (Bankr. Mass. 2001), *aff'd* 288 B.R. 617 (D. Mass. 2003).  As a result of those rulings, the Trustee had a cause of action to recover the $93,000, not on the basis that it was diverted "from" the receivership estate, but on the basis that it was diverted "to" the receivership estate (from the bankruptcy estates) and then distributed (with this Court's approval) to pay compensation for the Receiver and its counsel.[7]  In 2003, that cause of action was

_____

[6]  The United States is uncertain of precisely when the 400,000 shares of purchase money stock were sold but believes that it was some time in 2000.

[7]  The cause of action to recover the $93,000 was not founded on any allegation of wrongdoing on the part of the Receiver.  The Receiver relied on terms of the bankruptcy court order allowing it to use the interest.  But the government appealed that order, including explicit the provision allowing the Receiver to use the interest.  Wwhen the BAP reversed and held that the $1.2 million in principal should not have been transferred in the first place, it was a foregone conclusion that the interest as well was recoverable.

assigned to the United States under a separate settlement agreement between the Trustee and the United States, which settlement was approved by the Massachusetts District Court.  See In re Receivership Estate of Indian Motorcycle Mfg., Inc., 299 B.R. 8 (D. Mass. 2003).  The Trustee/IRS bankruptcy tax settlement explicitly specified that the $93,000 claim would be waived if the Receiver elected not to appeal any ruling approving that settlement agreement.  Since the later receivership tax settlement in fact provided for the withdrawal of the Receiver's appeal from the approval of the bankruptcy tax settlement (which had been stayed and never briefed), it was only logical for the Side Agreement to clarify that the assigned $93,000 claim would be extinguished.

5.  On page 5, Payne argues that the August 8, 2005 notice of the hearing on the approval of the Settlement Agreement did not mention the Side Agreement.  But the Side Agreement is summarized in the main Settlement Agreement, notice of which Payne admits "may have gone" to his then counsel of record in this matter.[8]  The notice indicated that a copy of the agreement and the motion to approve it would be made available to anyone requesting it.  And the motion for approval also made it clear that the Side Agreement was not confidential either.  The notice was approved by the Massachusetts District Court before it was sent out.

## Legal Issues

### *The Relief is Not Unprecedented*

6.  Payne asserts that the relief recommended is "unprecedented."  Payne asserts that Loughman v. Town of Pelham, 126 F.2d 714 (2d Cir. 1942), cited by the United States in replying to Payne's original opposition to the restitution motion, does not support the relief because,

---

[8]  The Receiver's notice of mailing, filed with the Massachusetts District Court on August 5, 2005, reflects that the settlement hearing notice was mailed to attorney Brad Schacht at his law firm at 950 17th Street, Suite 1600, in Denver, Colorado.  This address is still valid according to public records.

according to Payne, Loughman was a secured creditor and the distribution was subject to a reserved right of the receiver to seek clawback.  Payne's counsel has misread the case by confusing its main holding with a secondary issue.

Most of the opinion concerns a claim to recover the proceeds of bonds pledged by a bank to secure deposits (*i.e.*, a loan to the bank) held for a municipal corporation (the Town), on the theory that it was *ultra vires* for the bank to grant the security interest or pledge.  The bonds had a face value of $25,000 and covered a deposit of over $27,862.92.  The opinion explains that the foreclosure on the bonds (*i.e.*, their delivery by the escrow agent) had been agreed upon, subject to a clawback stipulation if the Town was not entitled to the bonds based on the theory that the security interest was invalid.  The Town sold the bonds for $25,122.99.  The receiver thereafter made separate distributions to the Town aggregating $2,749.93 – *i.e.*, the balance of the $27,862.92 in the deposit account, resulting in a 100% payout on the Town's partially secured and partially unsecured claim.

While agreeing with the receiver that the bank's pledge was *ultra vires*, the court of appeals concluded that the receiver's action for recovery of the bonds was time barred.  But the opinion separately ruled that the receiver could recover the $2,749.93 in aggregate dividends distributed later, to the extent the total amount received by the Town exceeded its proper ratable dividend from the receivership estate on what should always have been treated as a general unsecured claim (because the pledge was invalid).  The dividends had been paid within the six-year period of limitations on an action for money had and received.  Thus, they were subject to the receiver's claim for restitution.  Id. at 717.

Most importantly, the clawback stipulation urged by Payne was associated with the turnover of the pledged bonds, which, at the time the escrow agent was permitted to release them to the Town provisionally, were under active dispute as to the validity of the security interest.  But

the subsequent dividend distributions on the admittedly unsecured portion of the Town's claim were merely ordinary receivership distributions that the court of appeals held had been paid under a mistake of law (because the bank was not entitled to them in light of the fact that it had already received over $25,000 on a $27,862.92 deposit account based on an invalid claim of security). There is no indication from the opinion that the dividend distributions were stated to be tentative, provisional, interim, or anything materially different than the ones approved in 1999 and 2000 in the instant case.

### *Payne's Due Process Contentions Miss the Mark*

7.  Payne insists that the Receiver was required to proceed by summons and complaint. Payne is wrong.  Where a receiver makes a distribution ratably (including 100%) among creditors for whose benefit the receiver was appointed, and who have elected to file claims, the proper remedy, if the distribution is later determined to be excessive, is a motion for disgorgement or restitution and, to the extent required, for modification of any prior order under which the excessive distribution was authorized.  The claimants, having submitted their claims, cannot object to the jurisdiction of the receivership court to resolve the matter within the already pending action. Any other rule would be unadministerable inasmuch as receivers often make dividend distributions to thousands of creditors and it would be absurd to hold that they must all be sued separately (possibly in different venues) for recovery.[9]

---

[9]  The United States previously made a similar argument that the Receiver was required to proceed by complaint – when the Receiver sought disgorgement from the IRS for the funds it received based on its levy for Mr. Mandelman's taxes on the $2 million promised to him, based on the Receiver's claim for reformation or rescission of its contract with Mandelman.  Although the United States continues to maintain that its argument as to that cause of action was correct (notwithstanding that the Magistrate Judge rejected it), the situations are readily distinguishable. Mr. Mandelman had no claim against IMMI and did not file any claim with this Court.  Instead, he entered a post-receivership contract with the Receiver in its fiduciary capacity, under which Mandelman, after an earlier dispute that was settled with Court approval on November 24, 1997, was promised $2 million in cash "at the final closing on the sale of the assets."  (DI# 546 (transcript).)  The Receiver's claim to recover the money was that the contract had been

Moreover, Payne's original opposition to the Receiver's motion did not argue that a complaint and summons was necessary. It did argue that there was insufficient time to respond and that discovery should be allowed but those are separate issues. Even if the Court rules that discovery is appropriate, it should not order the Receiver to file 400 complaints or even one complaint against 400 defendants.

8. Payne also complains about the short time he had to respond to the Receiver's motion and his lack of access to discovery. While this objection might otherwise have raised some concern, it is rendered immaterial by Payne's failure to posit facts that might alter the outcome.[10] Payne's motion for leave to submit testimony, in this regard, while suggesting it may be appropriate to consider a sworn declaration, does not include any such declaration or even identify what facts Payne suspects exists that would make it inappropriate for the Court to require distributees to return to the estate at least that portion of their distribution which reflects the excess over the sums they would have received if the Receiver had reserved sufficient cash to pay the tax.

Payne's objection/memorandum does posit some facts he apparently believes would make a difference, but he is wrong in that regard as a matter of law. He states that the Receiver has

_____

breached by Mandelman or had been based on a misrepresentation by him such that it could be partially rescinded or reformed. There is in fact legal precedent for requiring a receiver to file a separate complaint when it asserts a contract action against a party with whom the receiver has entered a contract during the administration of the receivership estate. Indeed, but for the fact that Mr. Mandelman's contract explicitly provided that venue for any dispute would be in Colorado, the Receiver would have had to file a civil action against him in Wisconsin. But the venue provision did not waive a right to a complaint for breach, rescission, or restitution in respect to payment under a contract with the Receiver. The situation for Payne and the other general creditors is quite different as they filed general claims and they are not being suit for breach, fraud, or any other alleged wrongdoing. The distributions ordered with respect to their claims are simply being adjusted based on a higher priority tax claim that was not accounted for when the distributions were made.

[10] It should be noted that, before the Receiver filed the restitution motion, it indicated its intention to do so and invited all claimants to appear for a court status conference at which the Receiver and the government answered questions about the history of the proceedings. Payne participated in the conference and personally asked questions.

"likely known of the Tax Claim since 2000," but, as noted above, that supposition is based on confusing the bankruptcy tax audit with the receivership tax audit.  Nor is any discovery required on this point, because the public record in this case (including while it was pending before the Massachusetts District Court) is replete with explanations of the status of the tax investigations at various times, based on sworn declarations of the revenue agents who conducted the tax examinations in both jurisdictions.  What is beyond dispute is that the IMMI tax investigation could not have begun before the distributions at issue given that the tax return for the year ended September 30, 1999, was filed in January 2000.  Once the IMMI tax audit got underway (which was significantly after the commencement of the audit of the bankruptcy debtors' returns), the Receiver expended considerable effort to persuade the IRS not to assess any tax and, after the assessment was made in mid 2002, litigated its propriety on various grounds.  While the United States believes that the Receiver's substantive positions on some of the issues were strained, it is beyond peradventure that no court would have entertained a motion by the Receiver for restitution from claimants while the tax issues remained under litigation (and possibly even until appeals were exhausted).

In this connection, Payne again errs factually in stating that there was a tax judgment in 2003.  The June 6, 2003 ruling did not compute the amount of tax – it only ruled on the substantive disputes and called for submission of a computation.  The Court did not accept the computations of the tax resulting from the IRS adjustments to income until a subsequent order and, even then, reserved ruling on the possibility of a capital loss carryback claim that the Receiver had not yet given up and which, if correct (it was not), would have reduced the tax principal by about $400,000 (carrybacks do not eliminate interest accrued between the carryback year and the loss year, or penalties).  See In re Indian Motorcycle Litigation, 307 B.R. 7 (D. Mass. 2004).  There was no "judgment" for the receivership tax amount until the Court entered the Rule 54(b)

judgment in conformity with its simultaneous approval of the settlement agreement in September of 2005.

Payne represents that if permitted to testify, he would present evidence of hardship and reliance.  He states that he settled his claim against Mr. Mandelman for damages for less due to the 100% payout in this case.  In light of that 100% payout, however, one might wonder why Payne claimed any damages (which he then settled by collecting $100,000 of the $2 million distribution to Mandelman, on top of Payne's 100% payout).  Moreover, Payne cannot conceivably argue that his inchoate claim for damages against Mandelman had priority over the federal tax liens that underlay the IRS levy that resulted in $1,626,043 of Mandelman's $2 million distribution going to the IRS in 1999.  Coupled with the $100,000 Payne received and $50,000 credited against a prior distribution, this left Mandelman with $223,957.

Payne also represents that he would testify that he distributed part of the funds to his ex-wife incident to a divorce settlement.  He does not say whether it was in satisfaction of a fixed sum or whether, instead, the money was treated as part of the couple's combined marital property subject to equitable division.  If the latter, Payne is presumably entitled to ask his ex-wife for contribution.  If he used the funds to satisfy a fixed debt, then he received the full benefit of the distribution and this fact is wholly without relevance to whether he should be liable for the excessive portion of the distribution he received.

9.  Payne points out that many of the notices to other claimants have been returned undeliverable, but that does not implicate due process concerns applicable to Payne himself.  As to claimants who did not receive notice because the addresses were no longer valid, and where no attorney had filed an appearance for the claimant, such claimants would arguably have grounds to seek reconsideration of any restitution order *as to them* at such time that they finally do receive

notice (assuming they then articulate a meritorious opposition).[11]

### *The Receiver's Standing and Status*

10.   Payne argues (p. 15) that the Receiver lacks standing to bring a motion that benefits the United States, and must not take sides in what is an inter-creditor dispute.  This argument is frivolous.  The rule that an estate fiduciary does not take sides in an inter-creditor dispute refers to where the outcome does not directly implicate the duties of the fiduciary.  For example, if one creditor moved to equitably subordinate the claim of an otherwise higher priority creditor, the fiduciary should not help the higher priority creditor defend (although a fiduciary can itself move for equitable subordination in appropriate circumstances).[12]  But without equitable subordination, a fiduciary has a duty to assure distribution of an estate in the order of the priorities under governing law.  When a mistake has been made, it has an equal duty to seek to correct it.  Stated otherwise, a fiduciary has a fiduciary duty to enforce statutory or otherwise well-settled priority rules.  Cf. 11 U.S.C. § 502(j).[13]  Here, the government's claim indisputably has priority over Payne's, both

---

[11]   The United States would disagree with any argument that a default judgment could be entered against a claimant who did not receive notice due to a change of address and expiration of any mail forwarding.  While it is normally required that parties inform a court of changes of address, the United States observes that where, as here, claimants received distributions many years ago with no express indication at that time that they might be called upon to pay the money back, they had little reason to anticipate having to supply address changes to the Court or to the Receiver.

[12]   The Receiver in this case sought to have the tax claim be equitably subordinated and lost based on the lack of a statutory waiver of sovereign immunity for equitable subordination of government claims in receivership actions (in contrast to the explicit abrogation of sovereign immunity for such a proceeding in a bankruptcy case).  See 6/6/03 Order of the Massachusetts District Court in this action.

[13]   Although Payne might contend that Bankruptcy Code § 502(j) is irrelevant in a receivership action, the way in which § 502(j) is worded belies that contention.  The provision first speaks of bases upon which a claim may be reconsidered after allowance or disallowance.  The final sentence then states only a negative – that "[t]his subsection does not alter or modify the trsutee's right to recover from a creditor any excess payment . . . ."  Since no other provision of the Bankruptcy Code codifies any "right to recover from a creditor any excess payment," it is apparent that the statute is referring to a judicially evolved right grounded in equity.  A

- 12 -

because the tax was incurred in the administration of the estate, and under 31 U.S.C. § 3713.

11.  Payne states that the Receiver has repeatedly acted as no other party could and, in support, refers vaguely to past *ex parte* communications with the Magistrate Judge.  From that Payne jumps to the argument that "For reasons known only to the IRS, the IRS has declined to seek disgorgement" and that "no authority exists to permit the Receiver to collect on behalf of the IRS and take a percentage of that collection."  To the contrary, the United States maintains that it is the Receiver's *duty* to attempt to correct a mistake in the distribution scheme caused by the Receiver's initial failure to have correctly reported the tax and/or held funds in reserve to cover a potential tax. The 37% assignment reflects the United States' determination, during the settlement negotiations, to limit disgorgement to the tax principal so as to minimize the risk that any claimant will be required to repay a sum that would leave that claimant with less than it would have received if no mistake had been made.  In other words, the United States took a "hit" in an effort to achieve equity (and demanded that the Receiver take a similar "hit" in the interest of achieving equity by limiting the combined tax, compensation, and other expense claims to less than the principal amount of the tax judgment that the government won in the litigation).  If, however, this Court were to conclude that the 37% assignment of the $1 million tax disgorgement is illegal, the appropriate remedy is to limit the restitution to the Receiver's collection of $630,000 plus the actual expenses the Receiver incurs prospectively, and order the $630,000 paid to the IRS.[14]  At all events, the United States does not understand how any *ex parte* communications that may have occurred long ago between the Magistrate Judge and the Receiver have any bearing on the current

bankruptcy trustee, like a receiver, normally does not take sides in inter-creditor disputes unless, again, the matter implicates the trustee's duty to respect lawful priorities.

[14]  The United States does not advocate this.  It only maintains that any invalidity of the partial assignment to the Receiver is not a basis upon which to deny restitution needed to pay the rest of the tax claim.

dispute.  The restitution motion is the outgrowth of a tax settlement that occurred while this matter was pending before the Massachusetts District Court.**15**

### *Payne's Statute of Limitations Contentions Are Incorrect*

12.  Next (pp.16-17) Payne argues that the restitution motion is barred by a two-year statute of limitations.  According to Payne, the six-year statute in C.R.S. § 13-80-103.5 applies only to express contractual debts, in support of which Payne cites Pound v. Fletter, 39 P.3d 1241, 1243 (Colo. App. 2001), and Curtis v. Counce, 32 P.3d 585, 588-89 (Colo. App. 2001).  Since no other statutory period is applicable, argues Payne, the two-year "catch-all" in § 13-80-102(1)(i) applies to what is, in substance, an equitable action for assumpsit or money had and received.

Preliminarily, the assumption that state law governs the issue is highly questionable.  The instant dispute involves distributions made by a federal court receiver pursuant to a federal court order that is interlocutory and therefore subject to "revision" at any time under the last sentence of Fed.R.Civ.P. 54(b).**16**

---

**15**  Given that the record reflects that the Magistrate Judge has previously acknowledged that there have been some *ex parte* communications involving advice sought by and given to the Receiver (see transcript of November 25, 1998 hearing, DI# 870), the United States notes that it would agree that it would be best to avoid any *ex parte* communications pertaining to any substantive issues being adjudicated or likely to come before the court for adjudication.  Payne does not allege that there were any such communications with respect to the Receiver's restitution motion.

**16**  In addition, since the Receiver is seeking restitution in order to satisfy a higher-priority federal tax claim, it may be that the only applicable period of limitation is the 10-year period for the collection of a timely assessed tax under 26 U.S.C. § 6502.  Surely that would be so if the United States sought restitution directly.  See Bresson v. C.I.R., 213 F.3d 1173, 1177-78 (9th Cir. 2000) (and cases cited in footnote 13 therein).  The Tenth Circuit's decision in this receivership action confirms that the IRS had three years from the filing of the tax return for the 1999 tax year to assess the tax before that collection period even began.  It timely assessed the tax in mid 2002 – by which time the two-year limitations period after distribution that Payne would have the Court had already expired.  In addition, the collection period does not expire with respect to a proceeding in court to collect the tax that is begun within the 10-year period. 26 U.S.C. § 6502.  To the extent the Receiver is recovering a portion of the distributions in order to satisfy the tax, the same rules should arguably be applicable.  If not, however, the United States reserves the right to commence civil actions against the claimants to establish their

Assuming *arguendo* that state law governs, Payne is wrong because the six-year statute – § 13-80-103.5 – applies.  We submit he also misreads the intermediate appellate court cases he cites but, assuming they hold as he asserts, they are plainly inconsistent with the explicit language of the 1987 amendment to § 13-80-103.5, and this Court should hold that the Colorado Supreme Court would not countenance such mischief.  As the Historical and Statutory Notes in the annotated version of the Colorado Revised Statutes confirm, "The 1987 amendment, in par. (1)(a), substituted 'to recover a liquidated debt or an unliquidated, determinable amount of money due to the person bringing the action' for 'of debt founded upon any contract or liability in action.'"  Thus, one of the very limitations for which Payne argues was removed from the statute.  Moreover, if, as Payne argues, the restitution sought here is akin to assumpsit, then it has been long established in Colorado that assumpsit is subject to a six-year limitations period.  See Winstead v. Criterion Ins. Co., 781 P.2d 170, 172 (Colo. App. 1989) (citing numerous cases, including Colorado Supreme Court cases, and holding that even an action "similar" to one for assumpsit could be brought within the six-year period).

Curtis v. Counce did not concern a claim for restitution (or assumpsit or money had and received).  It dealt specifically with an action that, in substance, was one for replevin or conversion of lottery winnings, which would be within § 13-80-101(1)(h).  That provision provides for a three-year period for actions in the nature of replevin or conversion "except as otherwise provided in section 13-80-103.5."  All that the court held was that "the reference in § 13-80-101(1)(h) to § 13-80-103.5 does not pertain to the phrase '[a]ll actions to recover a liquidated debt or an unliquidated, determinable amount of money due to the person bringing the action,'" but rather refers to other portions of § 13-80-103.5.  32 P.3d at 588-89.  Indeed, under the argument of the

---

liability to return the excess funds (the portion they should not have received) to the United States.

plaintiff in Curtis v. Counce, the exception would swallow the rule.  As part of its analysis the court cursorily remarked that the words "liquidated debt" and "unliquidated determinable amount" refer to "breach of contract" and cited a legislative hearing.  Assuming a statement of a legislator during a hearing could restrict the explicit terms of the statute, there is no suggestion the court was limiting this to express contracts.  As confirmed in Black's Law Dictionary, "general (common or indebitatus) assumpsit" is "an action of assumpsit brought upon the promise or contract implied by law in certain cases."  Indeed, the law implies an obligation to repay money that was paid by mistake, which is precisely why restitution claims of the kind at issue here are sometimes characterized as assumpsit.

Pound v. Fletter is distinguishable for similar reasons.   The entirety of the court's discussion on the issue was as follows:

> Although plaintiff concedes that his claims against Fletter are for breach of fiduciary duty, he argues that he is also seeking to recover based on a liquidated debt or an unliquidated but determinable amount of money, thereby placing his claims within the six-year limitation period under § 13-80- 103.5. We are not persuaded.  Section 13-80-103.5 applies only when there is a contract between the parties. Curtis v. Counce, 32 P.3d 585 (Colo.App.2001).

39 P.3d at 1243. Thus, as in Curtis, the plaintiff was attempting to circumvent the plain applicability of a more specific limitations provision – one regarding breach of fiduciary duty. That alone was sufficient to reject the argument, and the court's statement that § 13-80-103.5 applies "only when there is a contract" was unnecessary dictum that obviously cannot be read literally in light of the portions of § 13-80-103.5 that explicitly cover claims unrelated to contracts. And, again, the court was not addressing whether assumpsit should be treated as a contract claim since it is based on the theory of a contract implied at law.

The words of the specific six-year limitations period are unambiguous and do not include any reference to a contract.  All that is required is that the action be one to "recover a liquidated debt or an unliquidated, determinable amount of money."  As this Court has observed in an

different context, "a statute of limitations such as § 13-80-103.5 which specifically addresses a particular class of cases controls over a more general statute of limitations such as § 13-80-101." Trustees of Carpenters and Millwrights Health Ben. Trust Fund v. Lillard & Clark Const. Co., Inc., 780 F.Supp. 738, 741 (D.Colo. 1990).

### Payne's Assertion That "The Math Simply Does Not Add Up"

13.   Payne urges (p.18) that the "math simply does not add up" because 24.35% of $17 million (the total cash distributed) is more than $1 million.  The 24.35% figure is explained in paragraph 5(a) of the tax settlement agreement on file, and reflects the percentage of the tax judgment over the total distribution to *unsecured non-administrative claimants*.[17]  Much of the $17 million was disbursed to satisfy higher-priority administrative claims, including those who loaned money to the Receiver in exchange for receivers' certificates promising repayment with interest.  Those investors were, by prior court order and the terms of the certificates, entitled to repayment before creditors of IMMI or Motor.  Similarly, Mandelman and Michele Lean were entitled to their distributions ($2 million and $330,000 respectively) based on a contractual obligation incurred by the Receiver in purchasing the stock in the bankruptcy debtor corporations, which was approved by this Court originally in late 1995, and thereafter modified in a 1997 settlement also approved by this Court.[18]  See In re Receivership Estate of Indian Motorcycle Mfg.,

---

[17]  The tax with interest was used in the computation in recognition of the fact that the distributees might not be located or might be insolvent.  This is also why the settlement agreement provides for refunds to be re-distributed to claimants if the total amount recovered exceeds the maximum allowed by the settlement agreement, and is also an additional reason for allowing claimants to pay 20% if they pay promptly.

[18]  As this Court is aware, it was by virtue of that stock acquisition that the Receiver was able to persuade the bankruptcy Trustee and the Massachusetts Bankruptcy Court to allow a combined assets sale in which the receivership estate would receive all proceeds in excess of the amount needed to satisfy bankruptcy claims.  The theory at the time was that the combined trademark assets would be worth far in excess of the sum of the competing trademark claims – a theory that was borne out by the sale price.  The Mandelman contract thus paved the way for the receipt of $17 million in cash proceeds in the combined assets sale.

Inc., 299 B.R. 8, 41-42 (D. Mass. 2003) (reciting some of these facts).

14.  Payne also points out that there has been no judicial determination of the value of the remaining IMCOA shares.  We suspect that the Receiver would have no quarrel with the entry of an order requiring the Receiver to distribute the remaining shares ratably among those who comply with a disgorgement order, as long as it is not required to take any steps to get the share ownership change reflected on the books of the now defunct purchaser corporation.

### Relevance of Statutes to Equity

15.  Payne incorrectly asserts (p.20) that the restitution motion rests on an underlying assumption that the claimants could be held liable to the IRS pursuant to 26 U.S.C. § 6901.  To the contrary, while the Receiver suggested this in its motion, the IRS filed a statement in response that explicitly disavowed such reliance and observed that transferee assessments under § 6901 are not available.  The Magistrate Judge's report and recommendation does not in any way rely on any such theory of liability.  (The United States does maintain that if the Receiver's motion is denied, the United States may have its own causes of action against the claimants, but such liability would not be founded on an administrative transferee liability assessment under § 6901, which the government has acknowledged would be time-barred.)

16.  Payne then argues (also p.20)  that whether the tax claim in the receivership case would have priority over his claim "is a question of equity and is subject to equitable defenses."  The argument is untenable.  Debts due the United States have priority in a receivership action under 31 U.S.C. § 3713.  While it may be that equity comes into play where restitution is sought years after a distribution, it is not appropriate to confuse that issue with the issue of priority in the first place.  The government's priority is an indisputably correct predicate to the restitution motion.  Whether Payne has equitable defenses to the motion is a separate issue.  Moreover, even if the claims were of equal priority, as things now stand, Payne received 100 cents on the dollar and the

government has thus far received zero.

17.   Payne also argues that the Magistrate Judge erred in mentioning that the government maintains it could seek restitution itself under 26 U.S.C. § 7402(a), and argues that, as creditors of the taxpayer, the claimants who received distributions have no liability for the tax imposed on IMMI.  It is true that, as creditors, the claimants are not directly liable for the tax.  But they may nevertheless have liability to the United States at law or equity as transferees of the taxpayer, and 26 U.S.C. § 7402(a) would, in that event, enable the United States to file its own lawsuits against them because any amount the government collected would be applied to the tax.[19]  The courts have uniformly permitted the United States to assert all manner of transferee, fiduciary, or derivative liability theories to collect taxes from third parties under § 7402(a).  Examples include clawback statutes governing premature distributions from decedent's estates, similar statutes government judicial corporate dissolution proceedings, fraudulent transfer actions (where the property has been sold and liability is imposed for the amount received as proceeds), and actions to pierce the corporate veil and hold shareholders liable for corporate tax debts.

To be sure, where the liability to be imposed rests on a right rooted in equity and not codified into law, equitable defenses may be relevant, just as they may have some relevance in the current context of the Receiver's motion for restitution, directed at enabling the estate to satisfy the

---

[19]  Payne also erroneously states that the Magistrate Judge improperly relied on provisions of the Bankruptcy Code, citing paragraph 14 of the proposed order.  Those provisions were merely cited by analogy in support of a broader discussion demonstrating that administrative claims have priority over general claims in a receivership.  Indeed, many statutory rules in bankruptcy are codifications of rules that evolved under the laws of equity as applied to receiverships and other liquidation proceedings.  Similarly, Payne's criticism (p.25) of the Magistrate Judge's analogies to overpayments of tax refunds, social security payments, or welfare benefits, simply because such recoveries are statutory, misses the mark.  After the enactment of the statute permitting a suit to recover an erroneous tax refund, the Supreme Court held that a pre-enactment suit was proper based on general legal principles and that the statute was a confirmatory codification that simultaneously imposed a limitations period.  United States v. Wurts, 303 U.S. 414 (1938).

priority tax claim that should have been paid in the first place. But, again, Payne has not yet identified equities in his favor that override those in favor of the government and the Receiver. He cannot deny that he received a windfall. The fact that he used the money is not enough to justify having the higher-priority tax claim go unpaid. Using the money for personal expenses or to pay debts is not "detrimental" reliance. Assuming he were to adduce facts indicating "detrimental" reliance, that would then have to be weighed against the innocence of the United States, which has not received a dime on its tax judgment that is now over $1.6 million with interest (penalties were fully waived in the tax settlement). The IRS has already given up much in agreeing to accept $1 million in satisfaction of that judgment and then assigning 37% of that to the Receiver.[20]

### *The Receiver's Mistakes Do Not Justify Denying Restitution*

18. Suggesting possibly "unclean hands," Payne implies that it is more equitable to leave the Receiver with a potential personal liability to the United States under 31 U.S.C. § 3713(b), or to require the Receiver and its counsel to disgorge a portion of the compensation previously paid to them even though the Receiver's compensation also clearly had priority over Payne's claim. The United States will leave to the Receiver any response to that implication, except as follows. It is

_____

[20] Payne seems to imply that law has no bearing on the exercise of equitable discretion. That goes too far. The extent to which equities such as delay and detrimental reliance bear on the propriety of ordering restitution may vary depending upon the legal context. For example, the Supreme Court has held that restitution to restore parties who have complied with a judgment that is reversed on appeal to the *status quo ante* is a right so clear that its denial may be corrected by writ of mandamus. Baltimore & O.R. Co. v. U.S., 279 U.S. 781, 785 (1929). See also II *G. Palmer, The Law of Restitution*, § 9.9(b) at p.290 (1978) ("[a]lmost as a matter of course, restitution usually has been granted of money paid or other benefits transferred under a judgment subsequently reversed"). While the United States does not contend that a claimant's receipt of a distributions from an equity receivership is completely equivalent to the receipt of the benefits of a judgment that is promptly appealed an ultimately reversed, there are commonalities. In both situations, the transfer reflects a mistake of law pursuant to a seemingly lawful court order. To be sure, an appeal puts a litigant on notice that its right to keep the benefit of the judgment is under challenge. But where, as here, restitution could not be sought until the IRS prevailed on its disputed tax claim, it would be an abuse of discretion to deny restitution on the premise of laches or estoppel.

not a foregone conclusion that, absent restitution from claimants, the United States would prevail in any future litigation against the Receiver in a court of competent jurisdiction; nor it is a foregone conclusion that the United States would be able to collect even if it does prevail.  Thus, the United States maintains that the equities weigh in favor of removing the windfall received by the claimants so that the taxes that should have been paid are paid.  But the Court should reject Payne's suggestion that merely because the Receiver may have incurred statutory liability under 31 U.S.C. § 3713(b), the United States should be left to that remedy exclusively.[21]  As for Payne's comment (p.24) that the "Receiver's personal stake in the settlement of the tax claim" is relevant, the United States maintains that this argument should have been asserted in an objection to the settlement of the tax claim itself.  The Receiver's potential liability under 31 U.S.C. § 3713(b) was literally all over the record in this case for years, and the Side Agreement was expressly noted and summarized in the main settlement agreement filed with the motion to approve it.  Payne's then counsel of record received notice of that motion – a notice that explicitly stated that a subsequent motion for restitution would follow if the tax settlement was approved.  While the notice did say that the approval would not preclude defenses to a restitution motion, that does not mean that Payne may attack the integrity of the tax settlement at this stage based on the Receiver having had a potential personal liability.  Moreover, by the time of the tax settlement, the IRS had for the most part already won in substance.

### Payne's Laches and Estoppel Contentions are Meritless

19.  Payne also urges laches or estoppel (apparently based on laches, as there is no assertion of any misrepresentation), arguing that the Receiver should have sought restitution more promptly.  The argument is negated by the record.  The Receiver could not seek disgorgement for a

---

[21]  The issue of § 3713(b) is, as already noted, beyond the jurisdiction of this action, and the government cannot be bound by any findings that it would have no incentive to dispute here.

tax it maintained was not owed.  The assessment was made in mid 2002.[22]  The parties were then in the midst of the Multi-District Litigation (MDL) Panel proceeding.  After that concluded, the bankruptcy court proposed the consolidation of the cases via transfer of venue of this action to Massachusetts and withdrawal of the reference for the bankruptcy cases so that they would be under the direct jurisdiction of the District Court there.  The Receiver and IRS then litigated the tax issues and the government won summary judgment on the substantive arguments in June of 2003.  But the Court did not fix the amount until early 2004, and still held that it was subject to potential carryback claims and also held open the issue of penalties for trial.

After the tax amount was fixed in early 2004, the Receiver sent a RECEIVER'S NOTICE TO RECEIVERSHIP ESTATE to all claimants, including to Payne's then counsel of record.  That notice, dated April 28, 2005 (copy attached hereto), summarized the tax litigation, specified the amount of tax and interest found to be owing, stated that the estate lacks cash or saleable assets, and stated "it is likely that the Receiver will, in order to pay such administrative taxes and other administrative expenses, ultimately seek an order requiring that the beneficiaries of the Receivership Estate refund a portion of the money previously disbursed to them" and that "[a]ny such refunds will be in reverse order of the relative dignity of claims (*i.e.*, unsecured receivership creditors first and administrative creditors last)." Finally, the notice stated that the Receiver and the United States were currently in settlement negotiations."

The complex settlement agreement took a long time to negotiate.  As the agreement

---

[22]  On page 23 and again on page 25, Payne repeats his error in misunderstanding the 2003 "BAP 2" decision (289 B.R. 269) as referring to an estimate of a $4 million tax liability owed by the receivership estate, when the opinion is clearly referring to the potential liability of one of the three bankruptcy debtors.  The government's Rule 60(b) motion to reopen the Trustee/Receiver settlement, the denial of which was affirmed in that BAP 2 decision, was a motion directed at preserving the IRS ability to collect the *bankruptcy estate's tax liability* from the money allocated to the receivership estate under the Trustee/Receiver settlement.  The government determined not to appeal the denial of its motion to the court of appeals, having just reached a settlement with the Trustee before the BAP decision was issued.

expressly contemplates, the parties then had to move the First Circuit to partially remand certain appeals, in order to ensure the District Court's jurisdiction to approve the settlement and thereby moot the appeals.  When the settlement approval motion was filed, the Massachusetts District Court initially declined to set it for hearing because it perceived the agreement to have too many contingencies based on protective appeals it contemplated would be filed from the Rule 54(b) judgments, pending conclusion of the settlement approval proceedings.  The parties then negotiated a modification that eliminated the need for the protective appeals and provided for entry of Rule 54(b) judgments concurrently with the approval of the settlement.  Only then did the Massachusetts District Court set the matter for hearing on notice to all claimants, and approve the form of notice proposed.  All of this can be confirmed simply by reviewing the docket sheets and the pleadings and orders filed during the Massachusetts phase of this action.

Moreover, under Colorado law, the defense of laches is generally unavailable when a claim is brought within an applicable statute of limitations, unless the existence of special facts makes the delay culpable.  See Trustees of Carpenters and Millwrights Health Ben. Trust Fund, supra, 780 F.Supp. at 742.

### The Distribution Orders were Interlocutory

20.  Payne's last gasp (pp. 26-27) is an argument that the Distribution Orders were "collateral orders" subject to alteration only pursuant to Rule 60(b).  Payne is incorrect.  Putting aside whether a party can postpone appealing a collateral order until a final decree, the Distribution Orders were not appealable collateral orders.  They did not determine any disputed question, as there was no dispute.  The Receiver, having sought the orders, could not possibly have appealed them.  Nor did the orders themselves conceivably result in any irreparable harm.  They were interlocutory.  Payne misconstrues Rector v. United States, 20 F.2d 845 (8th Cir. 1927).  The case did not hold that an order was an appealable collateral order because it authorized a receiver to

disburse sale proceeds.  It held that an order that resulted in a reduction in royalties payable *to* a receiver was a collateral order.

Even if the Distribution Orders were appealable collateral orders, they are subject to modification under Rule 60(b)(6), given that the restitution could not have been sought within the one-year period applicable under Rule 60(b)(1), (2) or (3), since the tax first had to be determined.

### *Alleged Errors in the Proposed Restitution Order*

21.  Payne argues that it is improper for the proposed order to contain a "final" judgment against him if he fails to pay in 30 days, without complying with Rule 54(b) and notwithstanding that there could be supplemental disgorgement orders (Payne argues that Rule 54(b) does not apply to successive judgments on a single claim based on the same underlying facts).  In this respect the United States concurs.  The United States suggests it would be more appropriate to have the order simply require all claimants to repay the Receiver the applicable percentage of their distributions, and provide that if they fail to comply, fees and other collection expenses may be assessed against them unless they demonstrate insufficient assets to pay.  The Receiver can then elect to seek a Rule 54(b) judgment against those who maintain they are presently unable to pay and thereby waive supplemental disgorgement from them, or it may wait and see whether it needs disgorgement of a larger percentage from all claimants and seek Rule 54(b) certification at that time.[23]

22.  As a related point, Payne complains that the proposed order does not confirm the Receiver's representation that if there ends up being more disgorgement than required by the settlement agreement, there will be pro rata refunds.  The provision, however, is already set forth in the tax settlement agreement and was thus approved by the order entered by the Massachusetts

---

[23]  If the Receiver did seek a Rule 54(b) judgment against a claimant and thereby waive claims for additional  disgorgement in reliance on the claimant's representation of inability to make a significant payment, and the Receiver subsequently discovered facts that revealed the claimant had made material misrepresentations regarding available assets, the Receiver should be able to obtain relief from the judgment under Rule 60(b) for at least up to a year.

District Court.  There is no need to reiterate it (but neither does the United States object to duplicating the provision in a restitution order).

23.  As a further related point, Payne complains that there is nothing in the order to prevent the Receiver from collecting from some claimants and not others.  Why the Receiver would neglect to collect from any claimant that has sufficient assets is not explained by Payne.  But the answer is that the issue is premature.  The order would provide for claimants who pay promptly to pay only 20% and be credited with 28% (for all purposes other than potential refunds of overpayments).  If and when the Receiver seeks a supplemental disgorgement order – *i.e.*, increasing the percentage of the distributions to be disgorged – and if the Court is inclined to grant such supplemental relief at that time, it would then will be appropriate to include a right of contribution in favor of claimants who pay more against claimants who failed to pay and thus caused the need for the supplemental disgorgement order.

24.  Payne also argues that it is not be appropriate to deprive claimants of the right to avail themselves of the prompt-payment discount merely because they wish to assert equitable defenses unique to themselves.  As we have argued above, Payne has not asserted a viable equitable defense.  But assuming *arguendo* that the Court disagrees and is instead inclined to allow Payne more time to present facts in support of personal equitable defenses (such as Payne's implication that he acted in detrimental reliance by transferring some of the funds to his ex-wife in divorce settlement), there is a ready solution.  The Court could provide that Payne may take advantage of the prompt payment discount by remitting payment without prejudice to asserting unique fact-based equitable defenses, provided the asserted facts are fully and promptly detailed in a sworn declaration, and the Court may reserve judgment with respect to any such defenses.  (The tax settlement agreement already provides that claimants may pay without waiving any right to appeal.)  Any other claimant making a similar timely Rule 72 objection on that basis could be

accorded similar treatment.[24]

        25.  One additional respect in which we agree with Payne is that the restitution order should not include a provision for automatically charging claimants with up to a 35% surcharge for the Receiver's collection costs.  The Receiver's motion did not seek that relief at this time. Paragraph 5(c) of the tax settlement agreement provides, in pertinent part:

> If any claimant resists demands to comply with a disgorgement order entered in conformity herewith, the Receiver may seek to have such claimant ordered to pay, in addition to the original disgorgement percentage, the Receiver's expenses of collection from such claimant, including actual attorney fees.  (The parties do not intend the Court's approval of this settlement to preclude any claimant from opposing such a fees award, for example, by proving inability to pay the underlying disgorgement.)

Thus, it was anticipated that the Receiver would attempt to procure voluntary compliance and only thereafter seek to have non-complying claimants pay collection expenses, subject to the potential defense of inability to pay.

---

[24]  Claimants who received service of the restitution motion and either failed to oppose it or, having opposed it failed to timely object under Rule 72, are deemed to have waived any such opposition or objections.

**Conclusion**

The Magistrate Judge's report and recommendation should be adopted and the proposed order should be entered after making the changes suggested in paragraphs 21-25 above.

Dated this 6th day of January, 2006.

Respectfully submitted,

WILLIAM J. LEONE
Acting United States Attorney
District of Colorado


*/s/ Adam F. Hulbig*
ADAM F. HULBIG
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 683
Washington, D.C.  20044
Telephone: (202) 514-6061
Facsimile: (202) 307-0054
Email: adam.f.hulbig@usdoj.gov
            western.taxcivil@usdoj.gov

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that on this 6th day of January, 2006, I caused the foregoing **UNITED STATES' POSITION WITH RESPECT TO PAYNE'S OBJECTION (DI# 2048, 2049, 2050) TO MAGISTRATE JUDGE'S RECOMMENDATION TO GRANT RECEIVER'S MOTION FOR RESTITUTION** to be filed electronically using the CM/ECF system, which will serve all counsel registered for service by that means.

*/s/ Adam F. Hulbig*
ADAM F. HULBIG
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 683
Washington, D.C.  20044