**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  95-cv-0777-ZLW-OES

In re:   THE RECEIVERSHIP ESTATE OF INDIAN MOTORCYCLE MANUFACTURING, INC.

**ASSIGNEE'S SUPPLEMENTAL STATUS REPORT**

COMES NOW Credit Managers Association of California, dba Business Credit Services ("Assignee" or "CMA") as Assignee, pursuant to California Assignments for the Benefit of Creditors and General Assignments (the "ABCs") by Indian Motorcycle Company, Indian Motorcycle Corporation, Indian Motorcycle Real Estate Services, Inc., IMCOA Licensing America, Inc. ("IMCOA Licensing"), and IMCOA Holdings America, Inc. (collectively, the "Indian Entities"), and files this Supplemental Status Report with respect to the July 10, 2006 Status Conference in this matter.  Assignee states as follows:

1.   On June 16, 2006, the Receiver in this action filed a Supplement to Motion to Compel ("Supplement").  To the extent the Supplement raised issues relative to the Motion to Compel, the Assignee addressed such issues in the "Assignee's Response to Supplement to Motion to Compel" filed concurrently herewith.  However, the Supplement goes well beyond the issues relative to the Motion to Compel and lays out what appears to be the basis for the Receiver's alleged claims in this matter.  The Supplement is replete with inaccuracies, innuendo and outright fabrications.  While the appropriate place to address these allegations is in the context of a response to a complaint that has actually been filed (an issue that will be addressed in the context of the Motion to Reconsider this Court's Order granting an open extension to the Receiver to file such a complaint in Case No. 05-cv-1573), there is a concern that these

00045918                                            1

unsupported allegations will somehow be viewed as "offers of proof" in support of continuing the Receiver's parade of litigation.

2. Accordingly, the Assignee responds to each allegation made in the Receiver's Supplement as follows:

| PARA. | RECEIVER'S ALLEGATION | ASSIGNEE'S RESPONSE |
|---|---|---|
| 3 | "[O]ne document showed the agreement between the Indian Entities and CMA to improperly co-mingle the proceeds of the asset sales of the various Indian Entities." | *First*, the "bundling of the assets" of the various Indian Entities was front and center of the widely disseminated bid process almost three years ago. For the Receiver to somehow suggest that this is a "newly discovered" fact is disingenuous.<br>*Second*, there is nothing "improper" about the bundling of assets under California's Assignment for Benefit of Creditors law. |
| 4 | "This [bundling] agreement is contrary to the rights of creditors of the solvent Indian Entities (including Sterling and the receiver)" | *First*, the bundling is not contrary to the rights of any creditors as all assets were over-encumbered by secured claims.<br>*Second*, there were no "solvent Indian Entities."<br>*Third*, Sterling and the receiver have failed to show that they are creditors of any of the Indian Entities. The constant refrain that they are creditors of the Indian Entities is inaccurate. At best, Sterling and the Receiver's status can be described as a contingent claimant for a contingency (an un-paid indemnity claim) which never occurred, as all submitted indemnity claims were paid. |
| 4 | "In fact, it was exactly this sort of behavior [a bundling arrangement] that resulted in the tax order against the receiver in seven figures." | The Receiver's failure to address the tax issues of the Receivership Estate caused the tax order. The Assignee has properly addressed all tax aspects of its administration of the Indian Entities ABCs. Moreover, any such issue would fall within the purview of the IRS, not this Receiver. |
| 5 | ". . . many aspects about the security interest held by Audax is [sic] inconsistent with the facts." | To the extent the Receiver is implying that Audax did not have a valid, perfected first position security interest in all assets of the Indian Entities (as confirmed by the analysis of the Assignee), the Receiver is incorrect. |

00045918

2

|   |   |   |
|---|---|---|
|   |   | In fact, the Assignee's analysis of the validity of the Audax security interest was vetted and approved by the Creditors Committee in the Indian Entities' ABCs. |
| 9 | "One [of the subpoenas served on May 26, 2006] was on the receivership caption, based upon the receiver's contention that it and this Court have nationwide jurisdiction." | On May 26, 2006, the Assignee was served with one document comprised of a subpoena issued from the Central District of California stapled together with what purports to be another subpoena, also issued out of the Central District of California. The Assignee has objected in part and responded in part to this subpoena. |
| 12 | " - the receiver is conducting an investigation into all the claims the receiver has against Indian." | This statement is disingenuous for several reasons: (i) it is contrary to the December 14, 2005 Order of this Court [Docket No. 2015] that the Receiver has constantly cited as the "source" for its authority to conduct discovery; (ii) the Receiver has failed to articulate a single claim it "may" have against the Indian Entities; and (iii) the Indian Entities were dismissed from this Receivership Estate, with prejudice, over 5 years ago, per Judge Weinshienk's March 28, 2001 Order [Docket No. 1615]. |
| 14 | "[The Assignee] has only offered [a] cryptic explanation [as to why it will not participate in telephonic conferences with Mr. Block present]." | As discussed more fully in the Assignee's Response to Receiver's Supplement to Motion to Compel, the Assignee has concluded that the more expedient and accurate method of dealing with the discovery issues is to meet and confer with counsel, or to communicate by written correspondence. |
| 20 | " . . .the excess from the sale of assets in IMCOA Licensing America, Inc. was used to pay debts of the insolvent sister company Indian Motorcycle Corporation." | While it is true that the proceeds from the Indian Entities were bundled, there were no "excess" funds from the sale of assets of IMCOA Licensing America, Inc.  As has been explained to the Receiver numerous times, the assets of IMCOA Licensing America, Inc. were fully encumbered by a valid, perfected security interest.  Thus, all proceeds from the sale of such assets were also encumbered. |

| 21 | "Both Sterling and the receiver are creditors of IMCOA Licensing American [sic], Inc. and Indian Motorcycle Company;"[1] | At best, Sterling and the Receiver were *contingent* creditors of IMCOA Licensing America, Inc. and Indian Motorcycle Company. The contingency was that there be an unpaid indemnification claim made by the Receiver (or, once the Receivership had terminated, by Sterling), pursuant to the terms of the Indemnification Agreement. Various indemnification claims were submitted by the Receiver *and paid* by the Indian Entities over the course of the Indemnification Agreement. However, no indemnification claims have arisen or been submitted since September of 2003 and thus *no unpaid indemnification claim exists*. Therefore, neither Sterling nor the Receiver are creditors of any of the Indian Entities. Further, neither Sterling nor the Receiver filed a claim in any Indian Entity's ABC and both lack any standing to complain of the administration of the California ABCs. |
|---|---|---|
| 22 | "The manner in which Audax manipulated the operation of the Indian Entities for its own benefit has been partially demonstrated by at least one of the documents produced." | To the extent the Receiver is referring to the secured loan of Audax, the propriety of such loan and attendant security interest was analyzed and vetted by both the Assignee and the Creditors Committee in the ABCs and there was no "manipulation" found. The Audax loan – for many millions of dollars – was real and the security interest was simultaneously granted long before any applicable preference period. |
| 22 | "These documents support the receiver's contention that Audax disregarded the corporate distinctions of all of the Indian entities, and therefore supports the receiver's alter ego claims against Audax." | The alleged existence of an alter ego claim against Audax presupposes, at a minimum, one very important fact: that the Receiver *actually has a claim against the Indian Entities*. As set forth in the response related to Paragraph 21 above, neither the Receiver nor Sterling has any claim against the Indian Entities and thus, an alter ego claim against Audax is irrelevant. |

---

[1] The Receiver has alleged in various pleadings that Sterling and the Receiver are the sole creditors of Indian Motorcycle Company, IMCOA Licensing America, Inc. and IMCOA Holdings America, Inc., despite the fact that various creditors timely filed proofs of claim in the Indian Entities' ABC in California, based on their claim against one or more of these entities.

00045918        4

| | | |
|---|---|---|
| 23 | '[T]he receiver suspects that there were other irregularities in the manner in which [the Assignee] operated the Assignment Estates. | The Assignee administered the Indian Entities Assignment Estates in compliance with all relevant law; however, two additional responses are appropriate: (i) as set forth above, neither the Receiver nor Sterling filed a claim in the Assignment Estates in any of the Indian Entities, and they have no standing to complain of any action taken by the Assignee in the administration of the Assignment Estates; and (ii) even if the Receiver or Sterling had filed a claim in the Assignment Estates, a complaint with respect to any alleged "irregularities" regarding the California ABCs is properly brought in the appropriate California court. |
| 24 | "[A document produced by Audax] indicated that [the Assignee] obtained an increased purchase price [for the Intellectual Property Assets] by breaching that Settlement Agreement. | There is no dispute that the Intellectual Property Assets were assigned by the Assignee without requiring the purchaser of such assets to assume the obligations under the Indemnification Agreement at issue in *Sterling's* separate action against the Assignee (Case No. 05-1573). The question has always been: were there any damages suffered because of that assignment? The answer is no. The Receiver (or, post-termination of the receivership, Sterling) was entitled to indemnification by certain of the Indian Entities with respect to certain claims delineated in the Indemnification Agreement. After the Assignment for the Benefit of Creditors, the Assignment Estates shared in that indemnification obligation. *However, no unpaid indemnification claim ever arose*. If they had, the Assignment Estate would have paid them. Neither the Receiver nor Sterling was damaged in any way based on the non-assumption of the indemnification obligation by the third-party purchaser of the Intellectual Property Assets. |

| 25 | "[A]ll of the foregoing are the subject of the receiver's Court-Ordered investigation in this receivership . . ." | To the extent there is a "Court-Ordered investigation in this receivership," it is set forth in Paragraph 5 of Magistrate Schlatter's Order of December 14, 2005 (drafted by the Receiver), which reads as follows: *"Mr. Bondy argues that: (a) it is Indian that should pay restitution because it was Indian that got the money from those who converted to stock, dealerships, and motorcycles; and (b) Indian knew the stock was worthless, or would become worthless, when it engaged in the transaction with the electing claimants, and that the dealership arrangements would not be honored when it granted them. **The receiver, while preliminarily disagreeing with Mr. Bondy, has sought permission to conduct discovery on the subject.**"* (emphasis added). Thus, the two issues relevant to the "Court-Ordered investigation" are: (i) whether Indian received any distribution of funds from the Receivership Estate; and (ii) whether Indian knew the stock and/or dealerships were "worthless" in 1999 when issued or granted, respectively, to the electing claimants (i.e., Receivership claimants who *elected* to take stock or a dealership in lieu of a cash distribution from the Receivership Estate). |

3. The Receiver's purported claims appear to be based on three basic concepts: (i) that the Receivership was somehow defrauded with respect to the IMCOA stock it received in 1999 as part of IMCOA's purchase of the Indian assets from the Receivership Estate ("Stock Claims"); (ii) that the Receiver (actually, Sterling, pursuant to the complaint filed in 05-1573) was somehow damaged as a result of the Assignee transferring the Indian Intellectual Property to a third party purchaser (yet to be dragged into these proceedings) without requiring the purchaser to assume the contingent indemnification obligations under the Indemnification Agreement

("Indemnification Claims"); and/or (iii) that the Receivership was somehow damaged as a result of the Assignee's administration of the Assignment for Benefit of Creditors of the Indian Entities in California and, in particular, the sale of the assets of the Indian Entities ("ABC Claims"). It also appears that the Receiver is seeking to pursue an alter ego claim against Audax based on one or more of the forgoing "concepts."[2]

4. With respect to the Stock Claims, by definition, any such claims would lie against the Indian Entities, based on actions undertaken in 1999. However, the Receiver settled with the Indian Entities and in fact dismissed them, <u>with prejudice</u>, from the Receivership Estate in 2001. *See* Order dated March 28, 2001 [Docket No. 1615]. The Receiver should explain why he is attempting to "investigate" claims that were settled, waived, and/or dismissed *with prejudice* over five years ago. In any event, the Assignee has provided the Receiver with all stock related documents relating to the relevant period, and then some (i.e., all stock transactions through 2003). Finally, the Stock Claims have nothing to do with the Assignment Estates or the sale of assets of the Indian Entities.

5. With respect to the Indemnification Claims, the Receiver has confirmed that no unpaid indemnification claims exist under the Indemnification Agreement. Despite repeated requests, the Receiver has failed to present any unpaid indemnification claims to the Assignee – for the simple reason that there are none. The indemnification period under the Indemnification Agreement expired on December 31, 2005, except with respect to claims then in existence. No indemnification claims were in existence on December 31, 2005. Thus, the Receiver cannot complain of any unpaid indemnification claims and has suffered no damages. Because there

---

[2] The First Amended Complaint in the 05-1573 action filed by the Receiver/Sterling in February, 2006, contains the same basic claims, which are subject to the same fatal flaws described herein. The only additional claim in the First Amended Complaint relates to the Cash Fund, which is the subject of the pending action in this District Court, Case No. 06-cv-00076 LTB.

00045918                          7

were no unpaid indemnification claims, neither the Receiver nor Sterling has any claim based on the failure of the third party purchaser to engage in the act of assuming the contingent indemnification obligations under the Indemnification Agreement. Once this straightforward liability analysis is completed, the Receiver's ability to concoct a damages theory (e.g., it is entitled to all proceeds from the sale of assets of IMCOA Licensing America, Inc.; it "is entitled to the restitution of the marginal difference between the price [the Assignee] could have obtained for the IP Assets had they been sold with the Settlement Agreement or the Indemnification Agreement and the amount [the Assignee] actually received"; or "Sterling is entitled to the entire remainder of the Cash Fund"), becomes irrelevant. At bottom, the Receiver (and under some circumstances, Sterling) was entitled to indemnification of certain claims pursuant to the terms of the Indemnification Agreement. The Receiver (and Sterling) received everything they were entitled to under the terms of the Indemnification Agreement.

6. With respect to the ABC Claims, neither the Receiver nor Sterling have any standing to complain of actions taken in the ABC as they failed to assert any claims therein, notwithstanding notice and an opportunity to do so. Nothing the Assignee did in the ABC can affect the Receiver and/or Sterling because the Receiver and Sterling have not shared, and will not share, in any distribution from the Assignment Estates. Thus, it is difficult to imagine the Receiver's rationale for pursuing the Assignment Estates, other than in an attempt to extort money to pay its unpaid tax obligations. Furthermore, to the extent the Receiver and/or Sterling can establish standing with respect to the administration of the Assignment Estates, any action relating thereto is properly brought in the appropriate California court.

7. The Receiver's efforts to manufacture a cognizable claim have fallen flat not because of the "lack of documents produced," but rather due to the simple explanation that no

such claims exist. This Court should carefully scrutinize the Receiver's "investigation" in this Receivership, which the Assignee contends is merely a means to leverage parties in Case No. 05-1573 (in which *Sterling*, in its individual capacity, is the plaintiff) and extort money to pay the Receivership's unpaid tax obligations. In addition, the Court in 05-1573 should require Sterling to file its First Amended Complaint forthwith (or to deem the current First Amended Complaint as operative and allow the defendants to respond) so that the forgoing allegations may be tested through a Motion to Dismiss or a Motion for Summary Judgment.

    8. In the context of the Motion for Reconsideration of the Order Granting Receiver an Extension to File First Amended Complaint ("Extension Order"), the Receiver's discovery has been completed with respect to: (i) the Stock Claims, in that all stock related documents have been produced by the Assignee and Audax; (ii) the Indemnification Claims, in that the evidence of any such claims is squarely, and solely, in the possession of the Receiver; and (iii) the ABC Claims, in that no discovery is required to establish that the Receiver (and/or Sterling) has failed to file a proof of claim in the Assignment Estates, thereby obviating any ABC Claims. Therefore, if this Court denies the Assignee's Motion to Reconsider the Extension Order, the Assignee requests that the Court order that the First Amended Complaint be filed by July 18, 2006 (i.e., 20 days from June 28, 2006, the date of Audax's supplemental production). In the absence of such direction, all parties to this matter face an eternity in litigation limbo while the Receiver searches endlessly for the non-existent "smoking gun."

Respectfully submitted this 30th day of June, 2006.

**BIEGING SHAPIRO & BURRUS LLP**

By:    s/ Julie Trent
       Julie Trent, No. 17086
       4582 S. Ulster Street Pkwy., Suite 1650
       Denver, CO  80237
       Office:  (720) 488-0220
       Fax:  (720) 488-7711
       E-mail: jtrent@bsblawyers.com

       Robert Pitts
       LAW OFFICE OF ROBERT W. PITTS
       660 Newport Center Drive, Suite 400
       Newport Beach, California 92660
       T:  949-720-4125
       F:  949-720-4111
       E:  rpitts@lawrwp.com
       *Attorneys for CMA as Assignee of the Indian Entities*

## CERTIFICATE OF SERVICE

  I hereby certify that on June 30th 2006, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the parties who have entered a CM/ECF appearance in this matter.

  And by facsimile number to the following:

| | |
|---|---|
| Michael E. Chodos, Esq.<br>Michael E. Chodos, Attorney at Law<br>56 Malaga Cove Plaza<br>Palos Verdes Estates, CA 90274 | Fax: 310.791.1958 |
| Tom Quinn, Esq.<br>1600 Broadway, Suite 1675<br>Denver, CO  80202 | Fax: 303.672.8281 |

             s/ Julie Trent
             **Julie Trent**, No. 17086
             Bieging Shapiro & Burrus, LLP
             4582 South Ulster Street Parkway, Suite 1650
             Denver, Colorado 80237
             Telephone:  (720) 488-0220
             Fax: (720) 488-7711
             E-mail:  jtrent@bsblawyers.com