**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  95-cv-00777-REB-CBS

STERLING CONSULTING CORPORATION, as receiver for Indian Motorcycle Manufacturing Company, Inc.

Plaintiff,

v.

CREDIT MANAGERS ASSOCIATION OF CALIFORNIA, D/B/A CMA BUSINESS CREDIT SERVICES;
INDIAN MOTORCYCLE COMPANY;
IMCOA LICENSING AMERICA, INC.;
IMCOA HOLDINGS AMERICA, INC.;
INDIAN MOTORCYCLE CORPORATION;
INDIAN MOTORCYCLE REAL ESTATE SERVICES, INC.;
AUDAX PRIVATE EQUITY FUND LLP as agent for itself and for
AUDAX CO-INVEST, L.P.,
AUDAX SPECIAL PURPOSE CO-INVEST, L.P.,
AUDAX TRUST CO-INVEST, L.P.
PAHL & GOSSELIN, a professional corporation;

Defendants.

---

**FIRST AMENDED COMPLAINT**

---

Plaintiff Sterling Consulting Corporation, as receiver (the "receiver"), by and through its

counsel Fairfield and Woods, P.C., complain against the Defendants:

**THE PARTIES, JURISDICTION, AND VENUE**

1.      The receiver is a Colorado corporation with its principal place of business in

Colorado.

2.      This is an action which grows out of the *in rem* jurisdiction of this Court as the receivership Court.  This Court has national *in rem* jurisdiction for any matter which concerns the receivership *res*, regardless of minimum contacts analysis, under 28 U.S.C. § 754.

3.      This matter is ancillary to the Receivership Action and this jurisdiction resides in this Court under the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367.[1]

4.      Defendants Indian Motorcycle Company, IMCOA Licensing America, Inc., IMCOA Holdings America, Inc., Indian Motorcycle Real Estate Services, Inc., and Indian Motorcycle Corporation (separately referred to as "Company," "Licensing," "Holdings," "Realty," and "Corporation," respectively and collectively referred to as the "Indian Entities") are Delaware corporations in the case of Company, Licensing, Holdings, and Realty, and a California corporation in the case of Corporation.

5.      The principal place of business of the Indian Entities is not Colorado.

6.      Defendant Credit Managers Association of California, d/b/a CMA Business Credit Services ("CMA") is a California nonprofit corporation with its principal place of business in California.  CMA has approximately 2,100 member companies that represent more than 250 different categories of business operations.

---

[1]  Historically, a receiver seeking to enforce its right to possession of receivership property brought an adversary action under the case number assigned to the Receivership Action.  With the advent of computerized docketing, the Clerk of the United States District Court in the District of Colorado (in this Receivership Action) determined that the computerized system could not properly manage the docket of an adversary action under the same case number and required that adversary actions by the receiver must be brought under a different case number.  This determination, which has been followed by this receiver, is strictly administrative, and not procedural or substantive.

7.      Defendant CMA is the assignee under the assignment for the benefit of creditors executed by Corporation on September 26, 2003 (the "Corporation Assignment").

8.      Defendant CMA is the assignee under the assignment for the benefit of creditors executed by Realty on January 15, 2004 (the "Realty Assignment").

9.      Defendant CMA is the assignee under the assignment for the benefit of creditors executed by Company on May 12, 2004 (the "Company Assignment").

10.     Defendant CMA is the assignee under the assignment for the benefit of creditors executed by Holdings on May 12, 2004 (the "Holdings Assignment").

11.     Defendant CMA is the assignee under the assignment for the benefit of creditors executed by Licensing on May 12, 2004 (the "Licensing Assignment").

12.     There is no distinction at law between CMA in its individual corporate capacity and CMA as assignee under the Corporation Assignment, the Realty Assignment, the Company Assignment, the Holdings Assignment, or the Licensing Assignment (collectively the "Assignments").

13.     CMA is named as a Defendant in this complaint in its individual corporate capacity, which includes CMA in its capacity as assignee under the Assignments.

14.     This action includes a claim for breach of a settlement agreement dated August 31, 2000 and approved by Order of the Colorado District Court (the "Settlement Agreement"). A copy of the Settlement Agreement is attached hereto as Exhibit 1.

15.     This action includes a claim for breach of an indemnification agreement dated August 31, 2000 and approved by Order of the Colorado District Court (the "Indemnification Agreement").  A copy of the Indemnification Agreement is attached hereto as Exhibit 2.

16.     This action includes breach of contract and breach of fiduciary claim for breach of the Trust Agreement (the "Trust Agreement") attached hereto as Exhibit 3.

17.     This Court has the exclusive jurisdiction to hear this matter because it consented to such jurisdiction in the Settlement Agreement.  Paragraph 5.2 of the Settlement Agreement provides:

> Governing Law and Jurisdiction.  This Settlement Agreement shall be governed by law of the United States and the State of Colorado, except for Colorado choice of law rules should they require the substantive law of a different jurisdiction control. By approving this Settlement Agreement, the District Court consents to the Formal Dispute Resolution Process in Part 4 hereof.

18.     Paragraph 4.1 of the Settlement Agreement (referred to in paragraph 5.2 of the Settlement Agreement) provides:

> 4.1. Resolution of Disputes Prior to Discharge of Receiver.  If a dispute regarding this Settlement Agreement, the Indemnification Agreement, the Mutual Release, the Stock Option Agreement, or any related document should arise prior to the discharge of the Receiver, both parties consent to final resolution of the dispute by a Magistrate Judge pursuant to 28 U.S.C. § 636 who is not one of the Magistrate Judges who have previously entered Orders in the Receivership Action or any related action in which the Receiver was a party.

19.     This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the Plaintiff is Colorado residents and no Defendant is a Colorado resident.

20.     This Court has federal question jurisdiction over the Securities Fraud claims pursuant to 28 U.S.C. § 1331.

21.     This Court has federal question jurisdiction over property that is *in custodia legis* pursuant to 28 U.S.C. § 1331.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events giving rise to the claims occurred in this District and because the Settlement Agreement vests this Court with venue.

**GENERAL ALLEGATIONS AGAINST PARTIES OTHER THAN PAHL & GOSSELIN**

23.     On or about August 31, 2000, Company, Licensing, and Holdings entered into the Settlement Agreement with the receiver and Sterling Consulting Corporation in its individual, corporate capacity and not as receiver ("Sterling").

24.     The purpose of the Settlement Agreement was to induce Sterling to cooperate with Indian and Audax in connection with the famous Indian Motorcycle trademark (the "Trademark").

25.     The Settlement Agreement incorporates the Indemnification Agreement.

26.     The Settlement Agreement and the Indemnification Agreement both contained an agreement by Indian that prohibited Indian from assigning the Trademark without the consent of Sterling and the receiver.

27.     The Settlement Agreement contained the provision in paragraph 5.10 that prohibits the assignment of the Trademark and reads as follows:

5.10.   Assignment.  The Receiver and Sterling may not assign their obligations hereunder without the prior written consent of Indian.  Indian may not assign its obligations hereunder without the written consent of the Receiver (unless discharged) and Sterling.  This Settlement Agreement shall not, in any way, be construed as a limitation on Indian's right to assign a Purchased Asset, however, in the event of an assignment of all or substantially all of its Class 12 and/or all or substantially all of its Class 25 trademark rights in North America (comprised of the United States, Canada and Mexico, collectively), or the European Union (comprised of all member countries, collectively, as of the date of this Agreement), or all or substantially all of the Purchased Assets (whether in a single transaction or series of related transactions), Indian shall give the Indemnified Parties prior notice of the assignment and Indian shall require the assignee thereof to

assume the obligations hereunder.  An assumption of obligations by the assignee pursuant to this section 5.10 shall not, in any way, limit or diminish Indian's obligations. Notwithstanding anything herein to the contrary, Indian shall not execute an assignment that defeats the intent of this Indemnification.

28.     Paragraph 6.10 of the Indemnification Agreement reads the same as paragraph 5.10 of the Settlement Agreement except that it has an additional sentence at the end that reads:

Indian may not disclose the terms of this Indemnification Agreement to such proposed assignee unless such proposed assignee agrees to hold this Indemnification Agreement confidential.

29.     Pursuant to the Settlement Agreement, a cash fund of $50,000 was placed in escrow with Fairfield and Woods, P.C. (the "Cash Fund").

30.     On December 31, 2005, and absent any breaches of the Settlement Agreement, the Cash Fund was to be distributed to the Indian Entities and Sterling.

31.     Sterling has a claim against the Indian Entities' portion of the Cash Fund (the "Disputed Portion of the Cash Fund").

32.     No claims have been made against Sterling's portion of the Cash Fund (the "Undisputed Portion of the Cash Fund").

33.     As part of the receiver's sale of assets to Company, Licensing, and Holdings, the receiver was given stock in Company for the benefit of the Receivership Estate (the "Receiver's Stock").

34.     During 2000 and 2001, the receiver tried to sell the Receiver's Stock in Company, but its efforts were thwarted by representatives of Audax, who, upon information and belief, instructed the transfer agent not to transfer the stock.

35.     Upon information and belief, during the same period of time when representatives of Audax were instructing the transfer agent not to complete sales of the Receiver's Stock, principals of Indian and representatives of Audax were selling their own stock based on information they had about the future of Indian which was not available to the general public.

36.     On around October 1, 2003, CMA mailed a notice of the assignment for the benefit of creditors to certain creditors and others.  A copy of this notice is attached as Exhibit 4.

37.     On around October 3, 2003, CMA commenced marketing the assets of Indian (the "Indian Assets") through CMA.  A copy of the initial solicitation of the Indian Assets by CMA dated October 3, 2003 (the "Solicitation") is attached hereto as Exhibit 5.

38.     On information and belief, by October 3, 2003, Indian had completely ceased operations and could not participate in the marketing effort by CMA.

39.     Audax participated directly in the marketing effort of CMA to sell the Indian Assets.

40.     The Solicitation included the following passage on pages one and two: The assets of [Indian Motorcycle Corporation] include, but are not limited to the following:

        • Intellectual Property The assets include the following assets associated with IMC's business;

        1.      Trade Mark Rights – "Indian," "Indian Motorcycle," "War Bonnet Profile" and other variations associated with Motorcycles and Parts in 26 countries.  Additional applications and registrations for apparel in 52 countries. Trade marked product names include "Chief," "Scout" and "PowerPlus." Additional non-motorcycle related rights cover branded soft goods, café/restaurants and recreational vehicles.

      2.      Motorcycle and Accessory product designs, bills of material, sourcing and manufacturing processes for the Indian Motorcycle product line.

      3.      Product Licensing Agreements – 14 royalty based product licensing agreements covering Indian Motorcycle branded apparel, toys and home furnishings.

41.      Upon information and belief, the Solicitation misrepresented the marketing efforts of CMA.

42.      In fact, Corporation did not own the intellectual property of Indian as defined in the Solicitation (the "IP Assets").

43.      In fact, Licensing owned the IP Assets.

44.      Corporation could not and did not assign the IP Assets to CMA.

45.      Accordingly, CMA's offer to sell the IP Assets was fraudulent.

46.      On information and belief, CMA has represented that it had appropriate authority from all relevant parties to market the assets described in Exhibit 5.

47.      On information and belief, the appropriate authority claimed by CMA is derived from a purported bundling agreement with Audax dated February 10, 2004 (the "Bundling Agreement"), a copy of which is attached as Exhibit 6.

48.      CMA could not have made the Bundling Agreement with any of the Indian Entities because the Indian Entities had completely ceased operations by that time.

49.      On information and belief, the Bundling Agreement was actually between Audax and CMA.

50.     On information and belief, after the Corporation Assignment, but prior to the Licensing Assignment, the Holdings Assignment, and the Company Assignment, CMA and Audax conspired to sell the Trademark in violation of the rights of the receiver as a creditor of Company, Licensing, and Holdings.

51.     On October 8, 2003, Sterling sent a notice of breach to Indian advising Indian it had materially breached the Settlement Agreement and the Indemnification Agreement.  A copy of this notice is attached hereto as Exhibit 7.

52.     From and after October 8, 2003, various correspondence was exchanged documenting the breaches of contract and fraud by CMA, Indian, and Audax.  Copies of the relevant correspondence are attached hereto as Exhibit 8, Exhibit 9, Exhibit 10, and Exhibit 11. Exhibit 10 contains a detailed description of the circumstances in October of 2003.

53.     On information and belief, in or around July, 2004, CMA sold the IP Assets to Stellican, LTD, which includes Stellican Private Equity Group, Indian Motorcycle International, LLC, a Delaware limited liability company, and Indian Motorcycle Company FEIN 20-2819987, a Delaware corporation (all of which will be referred to as "Stellican").

54.     CMA did not require Stellican to accept assignment of the Settlement Agreement and the Indemnification Agreement when CMA sold Stellican the IP Assets, including the Trademark.

55.     CMA's sale of the IP Assets, including the Trademark, without the contemporaneous assignment of the Settlement Agreement and the Indemnification Agreement constitutes breach of the Settlement Agreement and the Indemnification Agreement.

56.     As a result of the sale of the IP Assets, including the Trademark, without contemporaneous assignment of the Settlement Agreement and the Indemnification Agreement, CMA was able to obtain a higher price than it would have been able to obtain if it had sold the IP Assets with the Settlement Agreement and the Indemnification Agreement.

57.     Sterling has assigned to the receiver its claim to the marginal difference between the price CMA could have obtained selling the IP Assets subject to the Settlement Agreement and the Indemnification Agreement and Sterling has assigned to the receiver its claim against the Disputed Portion of the Cash Fund (collectively, the "Assigned Claims").

58.     Sterling has not assigned to the receiver Sterling's claims to the Undisputed Portion of the Cash Fund.

59.     Upon information and belief, at the time of the sale by CMA, Licensing and Holdings had liabilities in excess of assets.

60.     Upon information and belief, at the time of the sale by CMA, Realty had assets in excess of liabilities.

61.     Upon information and belief, after the sale by CMA of Indian-related assets that had been assigned to it, CMA improperly commingled the payments received and used the excess cash from the sale of assets of Realty to pay the debts of Corporation.

62.     The excess from the sale of the assets of Realty should have gone to Realty's parent company, Indian.

63.     Upon information and belief, at the time of the sale by CMA, Sterling, Spokes, and the receiver were the only legitimate creditors of Indian.

64.     Upon information and belief, after the sale by CMA of Indian-related that had been assigned to it, CMA improperly commingled the payments received and used the excess cash from the sale of assets of Licensing to pay the debts of Corporation.

65.     Upon information and belief, after the sale by CMA of Indian-related that had been assigned to it, CMA improperly commingled the payments received and used the excess cash from the sale of assets of Holdings to pay the debts of Corporation.

66.     Upon information and belief, after the sale by CMA of Indian-related assets that had been assigned to it, CMA improperly commingled the payments received and used the excess cash from the sale of assets of Company to pay the debts of Corporation.

67.     After payment of the creditors of Realty, the excess from the sale of the assets of Realty was required to be paid to Realty's parent company, Company.

68.     After payment to Sterling, Spokes, and the receiver, as the only legitimate creditors of Licensing, the excess from the sale of the assets of Licensing should have gone to Licensing's parent company, Company.

69.     After payment to Sterling and the receiver, as the only legitimate creditors of Holdings, the excess from the sale of the assets of Holdings should have gone to Holdings' parent company, Company.

70.     Sterling and the receiver, as the only legitimate creditors of Company, should have been paid the excess from the sale of the assets of Company.

71.     CMA has consistently refused to disclose to Sterling and the receiver the financial information concerning the sale of Indian Assets.

### FIRST CLAIM FOR RELIEF

**(RECEIVER'S ASSIGNED CLAIM FOR BREACH OF CONTRACT AGAINST CMA—ASSIGNED CLAIMS)**

72.    By this reference, the receiver incorporates all other paragraphs of this First Amended Complaint

73.    CMA's transfer to Stellican of the IP Assets without the requirement that Stellican accept the Settlement Agreement or the Indemnification Agreement constitutes breach of contract.

74.    As a result, the receiver is entitled to the restitution of the marginal difference between the price CMA could have obtained for the IP Assets had they been sold with the Settlement Agreement or the Indemnification Agreement and the amount CMA actually received.

75.    This claim is based on conduct by CMA after assignment to it of the assets of the Indian Entities; as a result, the receiver is entitled to priority distribution from CMA and is not subject to pro-rata payment with claims based on conduct of Indian prior to assignment of its assets to CMA.

76.    All conditions precedent to the bringing of this claim have been met or waived.

**SECOND CLAIM FOR RELIEF**
**(RECEIVER'S ASSIGNED AND DIRECT CLAIM FOR FRAUD AGAINST AUDAX—ASSIGNED CLAIMS)**

77.    By this reference, the receiver incorporates all other paragraphs of this First Amended Complaint.

78.    Upon information and belief, at all times relevant hereto, Company had only three genuine creditors:  Sterling, Spokes, and the receiver.

79.     Upon information and belief, Company now has only three creditors:  Sterling, Spokes, and the receiver.

80.     Upon information and belief, by unlawfully shifting assets, Audax was able to increase the payment to itself beyond what was proper under the law.

81.     Upon information and belief, the actions of Audax constitute fraud upon creditors, including the receiver.

82.     Upon information and belief, the receiver has been damaged in an amount to be proven at trial.

83.     In 1999 the receiver closed its sale to IMCOA.

84.     Pursuant to that sale, IMCOA provided to the Receiver's Stock to the receiver for the benefit of the Receivership Estate and agreed to honor certain dealer commitments that IMMI had made prior to the appointment of the receiver.

85.     Upon information and belief, Audax, through its dominion and control of Indian from 2001 through 2003, caused the stock to become worthless and caused Indian not to honor its dealer commitments, or to make those commitments worthless.

86.     The actions of Audax constitute fraud upon creditors, including the receiver.

87.     As a result, the receiver has been damaged in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
**(RECEIVER'S DIRECT CLAIMS FOR BREACH OF FIDUCIARY DUTY AGAINST CMA FOR DIVERTING FUNDS OF REALTY)**

88.     By this reference, the receiver incorporates all other paragraphs of this First Amended Complaint.

89.     As an assignee under the Assignments, CMA is a fiduciary with respect to the creditors and owes them a fiduciary duty to exercise the utmost good faith.

90.     On information and belief, CMA sold the assets of Realty for more than the debts of Realty.

91.     CMA was obligated to pay the excess funds from the sale of Realty's assets to Company as Realty's corporate parent.

92.     Audax and CMA entered into an illegal agreement whereby CMA used excess funds of Realty to pay the creditors of Corporation pursuant to the Bundling Agreement.

93.     Under the Bundling Agreement, CMA also used some of the excess funds from the sale of assets of Realty to pay itself.

94.     On information and belief, the funds CMA paid to itself were in excess of the fees to which it was entitled.

95.     On information and belief, the CMA paid to fees out of Licensing for work done for Corporation.

96.     On information and belief, in exchange for the Bundling Agreement, CMA agreed to pay Audax $5.5 million out of the excess funds from the sale of the assets of Realty.

97.     On information and belief, CMA initially determined that the claims of Audax should be equitably subordinated to the general unsecured creditors of the Assignment Estates.

98.     On information and belief, Audax was not entitled to the payment of any funds from the Assignment Estates.

99.     On information and belief, due to the Bundling Agreement, CMA paid Audax money to which it was not otherwise entitled.

100.    As a result, the Receiver has been damaged in an amount to be proven at trial.

**FOURTH CLAIM FOR RELIEF**
**(RECEIVER'S DIRECT CLAIMS FOR BREACH OF FIDUCIARY DUTY AGAINST CMA FOR DIVERTING FUNDS OF COMPANY, LICENSING, AND HOLDINGS AND FOR IMPROPER SALE)**

101.    By this reference, the receiver incorporates all other paragraphs of this First Amended Complaint.

102.    As an assignee under the Assignments, CMA is a fiduciary with respect to the claimants in the Assignment Estates and owes them a fiduciary duty to exercise the utmost good faith.

103.    As an assignee under the Assignments, CMA is a fiduciary with respect to the non-consenting creditors of the Indian Entities (i.e., the creditors of the Indian Entities that have not filed claims), and owes them a fiduciary duty to exercise the utmost good faith.

104.    On information and belief, CMA sold the assets of Company for more than the debts of Company.

105.    On information and belief, CMA sold the assets of Licensing for more than the debts of Licensing.

106.    On information and belief, CMA sold the assets of Holdings for more than the debts of Holdings.

107.    CMA was obligated to pay the excess funds of Company, Licensing, and Holdings to Sterling, the receiver, and any other legitimate creditors of those companies.

108.    On information and belief, Audax and CMA entered into the Bundling Agreement whereby CMA used excess funds of Company, Licensing, and Holdings to pay the creditors of Corporation.

109.     On information and belief, under the Bundling Agreement, CMA also used some of the excess funds of Company, Licensing, and Holdings to pay itself.

110.     On information and belief, the funds CMA paid to itself were in excess of the fees to which it was entitled.

111.     On information and belief, in exchange for the Bundling Agreement, CMA agreed to pay Audax $5.5 million out of the excess funds of Company, Licensing, and Holdings.

112.     On information and belief, CMA initially determined that the claims of Audax should be equitably subordinated to the general unsecured creditors of the Assignment Estates.

113.     On information and belief, Audax was not entitled to the payment of any funds from the Assignment Estates until after the legitimate creditors of the Assignment Estates had been paid in full.

114.     On information and belief, due to the Bundling Agreement, CMA paid Audax money to which it was not otherwise entitled out of the excess funds of Company, Licensing, and Holdings.

115.     Upon information and belief, CMA did not accept the highest offer for the sale of the Indian assets.

116.     As a result, the Receiver has been damaged in an amount to be proven at trial.

### FIFTH CLAIM FOR RELIEF
**(RECEIVER'S ASSIGNED CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST CMA FOR REFUSING TO REJECT THE SETTLEMENT AGREEMENT AND THE INDEMNIFICATION AGREEMENT)**

117.     By this reference, the receiver incorporates all other paragraphs of this First Amended Complaint.

118.    On information and belief, Indian assigned the Settlement Agreement and the Indemnification Agreement to CMA.

119.    CMA accepted the assignment of the Settlement Agreement and the Indemnification Agreement.

120.    As a fiduciary to Sterling, CMA had an obligation to reject the Settlement Agreement and the Indemnification Agreement at the time it knew they would not be assigned to Stellican.

121.    By refusing to reject the Settlement Agreement and Indemnification, CMA breached this fiduciary duty to Sterling.

122.    Instead of rejecting the Settlement Agreement and the Indemnification Agreement, CMA insisted that they were both executory, thereby preventing Sterling and the receiver from filing claims for breach of contract.

123.    CMA insists to this day that the Settlement Agreement and the Indemnification Agreement are valid and enforceable executory agreements.

124.    As a result, Sterling has been damaged.

125.    To the extent the amount of damage to Sterling exceeds the Undisputed Portion of the Cash Fund, it has been assigned to the receiver.

### SIXTH CLAIM FOR RELIEF
### (RECEIVER'S DIRECT CLAIM FOR SECURITIES FRAUD AGAINST INDIAN AND AUDAX)

126.    By this reference, the receiver incorporates all other paragraphs of this First Amended Complaint.

127.     Upon information and belief, prior to the time Audax invested in Indian, Indian principals sold stock in Indian based on information regarding the status of Indian that was not known to the general public, while at the same time Indian blocked the receiver's attempt to sell the Receiver's Stock.

128.     The above-described actions constitutes fraud upon the receiver and the Receivership Estate by Indian in violation of 15 U.S.C. §78j(b) and 17 C.F.R. § 240.10b-5.

129.     After Audax invested in Indian, Audax allowed the sale of Indian stock by principals, including insiders, of Indian based on information regarding the status of Indian that was not known to the general public, while at the same time Indian and Audax blocked the receiver's attempt to sell the Receiver's Stock

130.     The above-described conduct constitutes fraud upon the receiver and the Receivership Estate by Audax and Indian in violation of 15 U.S.C. §78j(b) and 17 C.F.R. § 240.10b-5.

131.     Upon information and belief, Indian and Audax used the mails or an instrumentality of interstate commerce or a facility of the national securities exchange in furtherance of the actions complained of herein.

132.     Upon information and belief, in connection with the sale of its securities, Indian and Audax engaged in an act, practice, or course of business which operated as a fraud or deceit upon the Receiver.

133.     Upon information and belief, the conduct complained of herein was done knowingly by Indian and Audax.

134.    The receiver relied on the representations and omissions of Indian and Audax complained of herein.

135.    As a result, the receiver has been damaged in an amount to be proven at trial.


**SEVENTH CLAIM FOR RELIEF**
**(RECEIVER'S DIRECT CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT AGAINST INDIAN AND AUDAX)**

136.    By this reference, the receiver incorporates all other paragraphs of this First Amended Complaint.

137.    In 2001, the receiver had a contract to sell the Receiver's Stock.

138.    Upon information and belief, Indian, while controlled by Audax, instructed the Transfer Agent not to transfer the stock and thereby complete the sale.

139.    Upon information and belief, Indian and Audax gave the above instruction improperly.

140.    As a result, before the Receiver could sell the stock, it became worthless.

141.    Upon information and belief, Indian and Audax tortiously interfered with the receiver's contract to sell the Receiver's Stock.

142.    As a result, the receiver has been damaged in an amount to be proven at trial.

**EIGHTH CLAIM FOR RELIEF**
**(RECEIVER'S DIRECT CLAIM FOR BREACH OF CONTRACT AGAINST INDIAN)**

143.    By this reference, the receiver incorporates all other paragraphs of this First Amended Complaint.

144.    In connection with the sale to Indian, Indian agreed to provide dealerships to certain members of the Receivership Estate.

145.    In connection with the sale to Indian, Indian agreed to provide Indian-brand motorcycles to certain members of the Receivership Estate.

146.    Indian did not provide all the dealerships and all the motorcycles it contractually agreed to provide.

147.    As a result, the Receivership Estate has been damaged in an amount to be proven at trial.

148.    All conditions precedent to the bringing of this action have been met or waived.

<u>NINTH CLAIM FOR RELIEF</u>
**(RECEIVER'S DECLARATORY CLAIM THAT AUDAX IS THE ALTER EGO OF INDIAN)**

149.    By this reference, the receiver incorporates all other paragraphs of this First Amended Complaint.

150.    On information and belief, Audax operated the Indian Entities as an "alter ego or instrumentality."

151.    On or about July 5, 2001, Audax purchased sufficient Company preferred stock to have absolute voting control of Company, including its wholly owned subsidiaries, Holdings, Licensing, Corporation, and Realty.

152.    Upon information and belief, Audax gave certain stockholders preferential treatment to the receiver and other stockholders.

153.   On or about November 8, 2001, Audax cemented its absolute voting control of Company by amending Company's Articles of Incorporation without prior notice to the holders of Company's common stock.

154.   Using its position of control of Company, Audax drove the Indian Entities into insolvency between July 5, 2001 and about December 31, 2002.

155.   Upon information and belief, the Indian Entities were insolvent by December 31, 2002.

156.   On or some time after July 29, 2003, but before September 26, 2003, using its absolute voting control of Corporation, Audax forced Corporation to enter into an agreement (the "Credit Agreement") whereby Audax would loan Corporation up to $10.5 million.

157.   Upon information and belief, the receiver believes that Audax orchestrated the execution of the Credit Agreement starting months before July 29, 2003, culminating in the execution of the Credit Agreement, and the UCC-1 Financing Statement securing the Credit Agreement (the "Financing Statement"), on July 29, 2003.

158.   Upon information and belief, the receiver believes that Audax orchestrated the execution of the Credit Agreement starting on about July 29, 2003, culminating in the execution of the Credit Agreement, and the UCC-1 Financing Statement securing the Credit Agreement, months after July 29, 2003.

159.   At the time the Credit Agreement was forced upon Corporation by Audax, Corporation was hopelessly insolvent, and Audax knew at that time that the Credit Agreement was incapable of eliminating the insolvency.

160.    At the time the Credit Agreement was forced upon Corporation by Audax, Audax intended to use the Credit Agreement to capture the Trademark to the exclusion of all others.

161.    On information and belief, at the time the Credit Agreement was forced upon Corporation by Audax, Company, Licensing, and Holdings were solvent.

162.    On information and belief, at the time the Credit Agreement was forced upon Corporation by Audax, Licensing and Holdings were profitable.

163.    As a necessary component of its intention to capture the Trademark, Audax forced Company, Licensing, and Holdings to execute the Credit Agreement and the Financing Statement, thereby securing the loan under the Credit Agreement with an encumbrance against the Trademark.

164.    On information and belief, at the time the Credit Agreement was executed, Company was the sole shareholder of Corporation.

165.    On information and belief, at the time the Credit Agreement was executed, Company was the sole shareholder of Licensing.

166.    On information and belief, at the time the Credit Agreement was executed, Company was the sole shareholder of Holdings.

167.    On information and belief, at the time the Credit Agreement was executed, Audax was entitled to appoint all of the directors on Corporation's Board of Directors through its dominion and control of Company, and did appoint all the directors of Corporation.

168.    On information and belief, at the time the Credit Agreement was executed, Audax was entitled to appoint all of the directors on Licensing's Board of Directors through its dominion and control of Company, and did appoint all the directors of Licensing.

169.    On information and belief, at the time the Credit Agreement was executed, Audax was entitled to appoint all of the directors on Holding's Board of Directors through its dominion and control of Company, and did appoint all the directors of Holdings.

170.    On information and belief, at the time the Credit Agreement was made, no commercial lender would have loaned funds to Corporation on terms that were more favorable to the Indian Entities than those set forth in the Credit Agreement.

171.    On information and belief, at the time the Credit Agreement was executed, Company, Licensing, and Holdings had no commercially valid reason to execute the Credit Agreement.

172.    The loan made under the Credit Agreement was secured by the Financing Statement, and the Financing Statement encumbered all of the assets of the Indian Entities, including the Trademark.

173.    Audax and the Indian Entities were in possession of financial statements for the Indian Entities at the time the receiver requested copies of the financial statements.

174.    Prior to 2006, Audax and the Indian Entities refused to provide the receiver financial statements for the Indian Entities, even though the receiver was the holder of two million shares of common stock in Company.

175.    On information and belief, at the time the Credit Agreement was made, the Indian Entities had incurred tens of millions of dollars in debt, almost all of which was in Corporation.

176.    On information and belief, the only lender interested in making the Credit Agreement is a "loan to own" lender; that is, a lender more interested in a foreclosure than repayment of principal and interest.

177.    On information and belief, the only reason Audax entered into the Credit Agreement was to enable it to foreclose on the Trademark, thereby gaining possession of the Trademark without the millions of dollars of liabilities of Licensing, the company which owned the Trademark.

178.    On information and belief, in furtherance of its plan to foreclose on the Trademark, Audax compelled the Corporation Assignment and the Bundling Arrangement.

179.    On information and belief, Audax, through its dominion and control of Indian from 2001 through the time the Credit Agreement was made, caused Indian to publish financial statements for Indian and Corporation that confused and defrauded lenders, including vendors who provided credit to Indian Motorcycle Corporation, based upon the mistaken belief that Corporation owned the Trademark.

180.    Upon information and belief, the foreclosure scheme of Audax did not work because CMA recognized the potential fraudulent use of Company's financial statements, and threatened to pierce the corporate veil.

181.    On information and belief, Audax failed to observe the corporate entity by operating the Indian Entities or dealing with their assets and property as if they were its own.

182.    On information and belief, Audax used Indian as a shield in an attempt to evade the requirements of law and for the perpetration of the illicit and fraudulent activity set forth above.

183.    The receiver is entitled to a Declaratory Judgment that Audax is obligated to pay the debts of Indian, including the debts to the receiver.

184.     The receiver is entitled to restitution of the money diverted by Audax from Licensing and Holdings.

### GENERAL ALLEGATIONS AGAINST PAHL & GOSSELIN AND ALL PARTIES

185.     By this reference, the receiver incorporates all paragraphs of this Complaint.

186.     In 1999, the receiver sold the principal assets of the receivership estate to Licensing.

187.     In 1999, IMCOA was owned by Company.

188.     Upon information and belief, IMCOA remains a wholly-owned subsidiary of Indian.

189.     Terms of the sale included a payment of cash by IMCOA to the receiver for several hundred thousand dollars, which represented compensation to those who had paid to IMMI deposits (typically in the amount of $3,525) to reserve a new Indian-brand motorcycle that was to be manufactured by IMMI (the "Depositor Claimants").

190.     Many Depositor Claimants did not want their money back at that time, but rather wanted to have their deposits applied towards a new Indian-brand motorcycle to be manufactured by Indian.

191.     One of the terms of the sale from the Receiver to IMCOA was that IMCOA would allow the Depositor Claimants who wished to apply their $3,525 claim to a new Indian-brand motorcycle to be manufactured by Indian.

192.     Depositor Claimants who did not receive their deposits back at the time of the sale were given five years to decide whether to apply their deposit to a new Indian-brand motorcycle or to get their cash back.

193.     Because at that time the receiver incorrectly thought the receivership was about to wind up and the Depositor Claimants had 5 years to make a decision as to whether to get their deposit back or apply it toward a new Indian-brand motorcycle, a trust agreement was established with Pahl & Gosselin as trustee, to hold $123,545 (the "Trust Agreement").  A copy of the Trust Agreement is attached hereto as Exhibit 3.

194.     Pursuant to the Trust Agreement, Pahl & Gosselin was to hold the cash (the "Trust Funds") until each Depositor Claimant made its decision as to application of the deposit to a new Indian-brand motorcycle or get a refund.  If the decision were to purchase a motorcycle, the money represented by those Trust Funds was to be sent to IMCOA and applied to the purchase price of the motorcycle; if the decision was to get a refund, the money represented by those Trust Funds was to be sent to the Depositor Claimant.

195.     In September of 2003 through May of 2004, the Indian Entities publicly announced that they had ceased to do business.

196.     The cessation of business by the Indian Entities included the complete cessation of the manufacture of Indian-brand motorcycles.

197.     Between September of 2003 and May of 2004, each of the Indian Entities made an assignment for benefit of creditors under California state law, with CMA.

198.     The Trust Agreement provides that if at any time prior to December 1, 2005 IMCOA (or its affiliates) ceases to manufacture and offer for sale new Indian-brand Motorcycles, then the remaining Trust Funds must be returned to the receiver.

199.    In connection with the recent reconsideration of prior Orders for distribution by this Court, the receiver has learned that some Depositor Claimants neither got their deposit back nor had the Trust Funds been applied to the purchase of a new Indian-brand motorcycle.

200.    The receiver was informed by Mr. Pahl of Pahl & Gosselin that, at the request of Indian, Pahl & Gosselin returned the Trust Funds left in Trust (the "Remainder") to Indian or IMCOA.

201.    Mr. Pahl was uncertain of the date, but advised the receiver that he thought the payment of the Remainder to Indian was many years ago.

202.    The receiver was also advised by Mr. Pahl of Pahl & Gosselin that Pahl & Gosselin cannot account for any of the Trust Funds.

203.    Upon information and belief, in 2003 and 2004, the Indian Entities assigned all its assets to CMA, including the Remainder Indian had received from Pahl & Gosselin.

204.    Upon information and belief, CMA is in possession of the Remainder.

205.    The Remainder is property of this Receivership Estate.

### Tenth Claim for Relief
**(Breach of Fiduciary Duty—Pahl & Gosselin)**

206.    The receiver incorporates paragraphs One through Seventy and One hundred sixty-five and thereafter in this Complaint as if fully set forth herein.

207.    Pursuant to the Trust Agreement, Pahl & Gosselin owed the receiver and the Receivership Estate a duty to properly care and account for the Trust Funds placed in the Trust.

208.    By turning the Trust Funds, including the Remainder, over to Indian prior to December 1, 2005, Pahl & Gosselin breached its fiduciary duty.

209.    By failing to be able to account for the Trust Funds, Pahl & Gosselin breached its fiduciary duty.

210.    As a result, the receiver has been damaged.

**Eleventh Claim for Relief**
**(Breach of Contract—IMCOA and Indian)**

211.    By this reference, the receiver incorporates all other paragraphs of this First Amended Complaint.

212.    By accepting payment of the Trust Funds, including the Remainder, from Paul & Gosselin, prior to December 1, 2005, Indian and IMCOA breached the Trust Agreement.

213.    As a result, the receiver has been damaged.

214.    All conditions precedent in bringing this claim have been satisfied.

**Twelfth Claim for Relief**
**(Unjust Enrichment—Indian)**

215.    By this reference, the receiver incorporates all other paragraphs of this First Amended Complaint.

216.    In the alternative to its Eleventh Claim for Relief, the receiver alleges that by receiving the Remainder from Pahl & Gosselin prior to December 1, 2005, Indian was unjustly enriched.

217.    Under the circumstances, it would be inequitable for Indian to keep the Trust Funds.

**Third Claim for Relief**

**(Turnover of Estate Property—CMA)**

218.    By this reference, the receiver incorporates all other paragraphs of this First Amended Complaint.

219.    CMA received funds from the Indian Entities at the time the Indian Entities made their assignments for the benefit of creditors.

220.    Upon information and belief, CMA commingled the assets of Indian Motorcycle Company, IMCOA Licensing America, Inc., IMCOA Holdings America, Inc., Indian Motorcycle Corporation, and Indian Motorcycle Real Estate Services, Inc.

221.    Included in those commingled funds was the Remainder, which has improperly been given to the Indian Entities by Pahl & Gosselin.

222.    CMA must turn over those funds to the receiver.

**REQUEST FOR RELIEF**

Wherefore, the receiver pray for judgment in its favor in an amount to be proven at trial, punitive damages, costs, attorneys' and receiver's fees, pre- and post-judgment interest, restitution, a declaration that Audax is the alter ego of Indian and liable for its debts, and such other and further relief as the Court deems just and proper.

DATED this 10th July, 2006.

                        Respectfully submitted,

                        By:  *s/ John M. Tanner*
                        Fairfield and Woods, P.C.
                        1700 Lincoln Street, Suite 2400
                        Denver, CO  80203-4524
                        Phone:  (303) 830-2400
                        Fax:  (303) 830-1033
                        Email:  jtanner@fwlaw.com

                        Attorney for Plaintiff Sterling Consulting
                        Corporation, as receiver

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses or as indicated below or by United States Mail, postage prepaid:

Julie A. Trent
jt@bsblawyers.com

Robert W. Pitts
rpitts@lawrwp.com

Michael A. Chodos
michael@chodos.com

Eugene Sprague
esprague@bw-legal.com

Adam F. Hulbig
Trial Attorney, Tax Division
US Dept. of Justice
PO Box 683
Ben Franklin Station
Washington, DC  20044
adam.f.hulbig@usdoj.gov

Peter Sklarew, Esq.
Assistant Chief
Civil Trial Section, Northern Region
United States Dept. of Justice
Tax Division
PO Box 55
Washington, D.C.  20044

**Attorney for IRS**
Michael J. Pankow
Brownstein Hyatt & Farber PC
410 17th Street, Suite 2200
Denver, CO  80202

**Attorneys for Michael Payne**
mpankow@bhf-law.com
dgarfield@bhf-law.com

Richard A. Block
President
Sterling Consulting Corporation
4101 E. Louisiana Ave., Ste. 300
Denver, CO  80246
rblock@xpn.com


By:    *s/ John M. Tanner*
            Fairfield and Woods, P.C.
            1700 Lincoln St., #2400
            Denver, CO  80203
            Phone:  (303) 830-2400
            Fax:  (303) 830-1033
            Email:  jtanner@fwlaw.com


31