## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 95-cv-00777-REB-CBS

In re: Indian Motorcycle Manufacturing, Inc., a New Mexico Corporation

---

## RECEIVER'S BRIEF REGARDING BREACH OF CONTRACT BY CMA

---

Sterling Consulting Corporation, as receiver, by and through its attorneys Fairfield and

Woods, P.C., hereby follows its brief regarding breach of contract by CMA as follows:

### Statement of Facts

1.    In 1998, the receiver entered into a contract to sell the assets of the Receivership

Estate, including the famous Indian Motorcycle trademark (the "Trademark"), to Indian

Motorcycle Company, IMCOA Licensing America, Inc., and IMCOA Holdings America, Inc.

("Company," "Licensing," and "Holdings," respectively, "Indian" collectively).

2.    Indian was aware that anyone attempting to attack the Trademark would likely

seek the assistance of Richard Block, president of the receiver, who at that time knew more than

anyone else on earth about the weaknesses in the Trademark.

3.    As a result, Indian approached Sterling Consulting Corporation, in its individual

corporate capacity ("Sterling"), about an arrangement that would give Mr. Block and Sterling

motivation to cooperate with Indian, while prohibiting Mr. Block and Sterling from cooperating

with anyone attempting to attack the Trademark.

4.    Simultaneously, Mr. Block was concerned that he was being dragged into the

affairs of Indian Motorcycle, and would continue to be dragged unwillingly into litigation about

the Trademark for years to come.

     5.     On August 31, 2000, Sterling and Indian signed a number of related contracts (collectively referred to as the "Settlement Agreement").[1] The Settlement Agreement provided *inter alia* that Mr. Block and Sterling would not provide information adverse to Indian absent compulsory process, and in the event of compulsory process and breach, Sterling would be compensated by Indian at predetermined rates.

     6.     The Settlement Agreement further provided that Indian would put $50,000 into escrow (commonly referred to as the "Cash Fund"). The Cash Fund would be used to assure Indian would honor its obligations to Sterling. First, if Sterling had a claim that was not reimbursed promptly by Indian, resort could be had to the cash fund for those expenses (including hiring counsel). *See* Exhibit 1 at §5.13 "Resort to Cash Fund."

     7.     The Settlement Agreement further provided that on January 1, 2006 (by which time all parties expected the receivership would be long closed) the money would be divided half to Indian and half to Sterling. *Id.* at §5.14.[2] By January 1, 2006, all claims by Sterling should have been paid, either directly by Indian or out of the Cash Fund with Indian then replenishing the Cash Fund. *See* Exhibit 1 at §5.13 "Resort to Cash Fund."

     8.     Out of Sterling's well-founded concern that Indian's obligations under the Settlement Agreement would be separated from the Trademark (thereby rendering the Settlement Agreement largely meaningless to Mr. Block and Sterling), the Settlement Agreement required

---

[1] The two most important contracts for purposes of this brief—the Settlement Agreement and the Indemnification Agreement—are attached as Exhibits 1 and 2.

[2] Although the receiver was a party to the Settlement Agreement and the Indemnification Agreement, contrary to

that they "run with the Trademark," that is, Indian was prohibited from assigning the Trademark unless it also assigned the Settlement Agreement to the same party.[3]

     9.     Since shortly after the Settlement Agreement was signed, Mr. Block and Sterling have been approached by various parties who sought assistance in connection with the Indian Trademark, primarily to attack the Indian Trademark. *See* Affidavit of Richard Block, attached as Exhibit 3. In reliance on the Settlement Agreement, Mr. Block and Sterling declined all such overtures. While it is certain these engagements would have been substantial, it is impossible to know precisely how much they would have generated had Mr. Block or Sterling been hired by one or more of those parties.

     10.    In 2003, Indian went out of business and Indian and its subsidiaries made successive assignments for the benefit of creditors to CMA. Indian assigned both the Indian Trademark and the Settlement Agreement to CMA, thereby breaching the Settlement Agreement for the first time. The Settlement Agreement provides at paragraph 5.10: "Indian may not assign its obligations hereunder without the written consent of the Receiver (unless discharged) and Sterling." Neither the receiver nor Sterling consented to the assignment (actually, neither was even given the opportunity to object).

     11.    It is undisputed that CMA accepted the assignment of the Trademark.

     12.    Within a few months of the assignment for the benefit of creditors of Licensing,

---

assertion of Mr. Payne's attorney, the receiver has never been a beneficiary of the Cash Fund.
[3] Paragraph 5.10. of the Settlement Agreement provided, in pertinent part: "Assignment. . . . Indian may not assign its obligations hereunder without the written consent of the Receiver (unless discharged) and Sterling. . . . [I]n the event of an assignment of all or substantially all of its Class 12 and/or all or substantially all of its Class 25 trademark rights . . . Indian shall give the Indemnified Parties prior notice of the assignment and Indian shall require the assignee thereof to assume the obligations hereunder. . . . Notwithstanding anything herein to the contrary,

CMA assigned the Trademark to a third party contained within the Stellican Group.[4]  Despite the

clear language in the Settlement Agreement, CMA did not require the Stellican Group to accept

the assignment of the Settlement Agreement along with the Trademark.  This was the second

breach of the Settlement Agreement, and one which CMA admitted in its Response to the

Receiver's Supplement Regarding the Receiver's Motion to Compel, at page 5:

> There is no dispute that the Intellectual Property Assets were assigned by the
> Assignee without requiring the purchaser of such assets to assume the obligations
> under the Indemnification Agreement at issue in Sterling's separate action against
> the Assignee (Case No. 05-1573).  The question has always been:  were there any
> damages suffered because of that assignment?

13.     During the 2005 calendar year, Sterling made demand upon CMA for

compensation for CMA's breach.  Particularly, when Sterling learned that CMA separated the

obligations under the Settlement Agreement from the Trademark because by doing so it was able

to sell the Trademark for more money, Sterling claimed that the marginal difference between

those two amounts was its property as restitution for the breach.

14.     CMA's failure to pay this restitution triggered Paragraph 5.13 of the Settlement

Agreement, which provides:

> **Resort to Cash Fund.**  If Indian shall be in default of its obligations to Indemnify
> an Indemnified Person hereunder . . . in respect of any Claim, the Indemnified
> Person may, at its option, give notice in writing to the Fund Agent specifying the
> amount due and payable and the Fund Agent shall promptly pay the said amount
> demanded from the funds available in the Cash Fund.

15.     Because CMA refused to state exactly how much more it made by breaching the

---

Indian shall not execute an assignment that defeats the intent of this Indemnification."
[4]  The receiver has been informed and believes that, in fact, Audax was a participant with the Stellican Group.  If
this proves to be true, the assignment to the Stellican Group is *void ab inititio* under traditional law of assignments

Settlement Agreement and separating the obligations thereunder from the Trademark, however, it was impossible for Sterling to make a liquidated claim on the cash fund. Expecting, but not knowing, that the amount of restitution exceeded $25,000, Sterling demanded the full amount from the escrowee. CMA has also demanded the disputed $25,000 from the escrowee.

16.     Sterling later assigned the right to collect the disputed portion to the receiver, thus this brief is submitted by the receiver.

### Argument

## I.     CMA has breached and repudiated the Settlement Agreement.

As quoted above, CMA has admitted that it breached the Settlement Agreement by separating the obligations thereunder from the Indian Trademark. In fact, CMA's actions amount to repudiation. The Restatement of the Law of Contracts (Second), § 250, provides that a repudiation occurs when: "a voluntary affirmative act which renders the obligor unable to apparently unable to perform without such a breach." The consequence of repudiation is that, if coupled with a partial breach, renders the obligor liable for total breach. *Id.* at comment a. By transferring the Indian Trademark without the obligations of the Settlement Agreement, CMA has repudiated the Settlement Agreement. A determination of repudiation the Settlement Agreement, CMA has excused Sterling from future performance. *Id.* at § 253(2).

## II.     The Receiver is entitled to Restitution of CMA's Profits.

A.     Restitution is available for breach of fiduciary duty.

Although a breach of contract usually results in an award of damages (damage to the

---

for the benefit of creditors.

plaintiff) rather than restitution (benefit to the defendant), in the case at bar, restitution is the

proper remedy for several reason. First, as an assignee for the benefit of creditors under

California law, CMA owed a fiduciary duty to all creditors of Indian. *Long Lake Lumber Co. v.

Stewart,* 198 Wash. 348, 352, 88 P.2d 414 (1939) ("With respect to the creditors, he was a

fiduciary upon whom devolved the duty to exercise the utmost good faith."); *Sherwood Partners,*

*Inc. v. Lycos, Inc.,* 394 F.3d 1198 (9th Cir. 2005) ""'Custodian' is a different concept, which

includes receivers, trustees and assignee[s] under a general assignment for the benefit of the

debtor's creditors. . . . Custodians, instead of being by their nature creditors, stand in a certain

fiduciary relation to creditors."[5]

It is well-established that when the actions which give rise to the breach of contract claim

is a breach of fiduciary duty, the fiduciary is not allowed to profit at the expense obligee. *See,*

*e.g.*, Daniel Dobbs *Remedies*, §12.7(4), at p. 174 ("Restitution of the breacher's profits can be

allowed on the basis of wrongdoing in such cases [where the conduct is in breach of a fiduciary

duty] even though the wrongdoing also involved a breach of contract.").

Here, CMA owed Sterling a fiduciary duty to put Sterling's interests first. Instead, CMA

intentionally breached this duty so it could make a higher profit on the sale of its assets.

Restitution to the receiver (as assignee of Sterling's right to collect) is appropriate—any other

---

[5] CMA has attempted to avoid this duty by claiming that its duty to Sterling only arose if Sterling made a  claim in the assignment estate. This is an incorrect statement as a matter of law for at least three reasons: First, that is not what the law provides—it is status as creditor, not claimant, that matters. Second, CMA had an obligation to reject any executory contract that it did not intend to honor. To do what CMA did enables a custodian to obtain the benefit of a bargain without paying the consideration therefore. Third, no assignee for the benefit of creditors (or any other non-bankruptcy relief) can effect a discharge of any creditor's claim. *Int'l Shoe Co.* v. *Pinkus*, 278 U.S. 261, 265-66 (1929). As a result, the claim is good whether Sterling or the recever consents to the assignment for the benefit of creditors or not. In this instance, Sterling is a creditor of Licensing, and Licensing had an excess of funds after

6

award would allow CMA to profit by its breach of its fiduciary duties.

      B.    <u>Defendant should pay restitution because reliance damages exist but are difficult to prove.</u>

A second, independent basis for awarding restitution rather than damages is that, in reliance on the Settlement Agreement, Mr. Block declined several overtures for work adverse to the Indian Trademark. These reliance damages are extraordinarily difficult to quantify; as a result, restitution is the proper remedy. *See, e.g.* Daniel Dobbs *Remedies*, §12.7(1), at p. 161. Professor Dobbs states:

> The general principle is that upon the defendant's substantial breach or repudiation of an enforceable contract, the plaintiff is entitled to recover restitution of any benefits he has conferred in performance of the contract . . . . More commonly, a restitutionary recovery is merely an alternative remedy[17] for total or substantial breach of contract.

Footnote 17 quotes *Harris v. Metropolitan Mall*, 224 N.W.2d 519, 524 (Wisc. 1983): "The remedy of restitution is not limited to rescission cases. It is available as an alternative to those remedies which protect an injured party's expectation or reliance interests in the contract."

In this case, the right to collect Sterling's claim for reliance damages has been assigned to the receiver. It is very difficult to prove, and thus the receiver elects restitution instead, which is very easy to prove. The amount will be the difference between what CMA could have sold the Trademark for with the limitation in the Settlement Agreement and the price CMA actually received for the Trademark. While the receiver does not know this precise amount, it understands from informal conversations that CMA received no offers of substance while the Trademark was burdened with the Settlement Agreement, but received $2,500,000 once it

paying its legitimate debts of $2.5 million.

severed the Trademark. Thus the restitution appears to be $2,500,000.[6]

      C.    <u>Restitution is proper because the breach led to the increased profits.</u>

A third basis for restitution is the fact that it was the breach itself that led to the greater

profit. Counsel for CMA has admitted the obligations under the Settlement Agreement were

separated from the Trademark because by doing so CMA could sell the Trademark for a greater

price.

One of the other exceptions to the general rule that damages, not restitution, are the

remedy for breach of contract is where the breach itself generates the profits. *See, e.g.* Daniel

Dobbs *Remedies*, §12.7(4), at p. 175 ("The contract rule [damages, not restitution] does not

apply to cases in which the plaintiff's own property is used to generate the profits for the

defendant."). In this case, the Sterling has a property right in having the obligations under the

Settlement Agreement tied to the Trademark. It was the extinguishment of this right that led to

CMA's profits, thus CMA must disgorge those profits.

**III.**    **The disputed portion of the Cash Fund should be applied to restitution and be offset.**

The entire purpose of the Cash Fund was to assure performance by Indian of its

obligations under the Settlement Agreement. The mechanism is set so that if there was a claim

---

[6] This wide disparity is explained by the fact that the Settlement Agreement was sealed by Order of this Court at the request of Indian, and had not been unsealed at the time of the sale. In fact, on June 22, 2004, CMA filed its Emergency Motion to Unseal Indemnification Agreement in the District of Colorado in the Receivership Action. At the time, the case was pending in the District of Massachusetts, so Judge Weinshienk denied the motion for reasons of venue. CMA never

bothered to move to have the Settlement Agreement unsealed in the District of Massachusetts.

    As a result, any prospective buyer would necessarily be buying a "pig in a poke" because they were not allowed to view the Settlement Agreement. Few reasonable businesses would pay millions of dollars for a Trademark burdened by a contract they could not see. Thus it is not surprising that the difference between the price

for money and Indian did not pay it, then Sterling could collect it from the Cash Fund. Thus the expectation was that whatever was left in the cash fund as of January 1, 2006 would be surplus.

In this case, however, it is not. The restitution claimed by Sterling (and assigned to the receiver) are far in excess of the Cash Fund. Thus the simple language in §5.14 (likely to be highly-relied on by CMA) does not apply. That language presupposes Sterling had already been compensated for all breaches, something that had not happened by January 1, 2006 and something that has not happened to date.

Further, CMA has argued that any monies it owes to the receiver will be paid at four to six cents on the dollar. This is not correct for several reasons. First, Sterling's claim was against Licensing, an estate that had an excess of cash over liabilities. Second, Sterling's claim is for breach Licensing, an estate that had an excess of cash over liabilities. Second, Sterling's claim is for a wrong by CMA, not a pre-assignment wrong, thus it is akin to an administrative claim. Third, offset rights are typical in distressed company situations. *E.g.,* 11 U.S.C. § 553 (in bankruptcy code, unsecured claims treated as secured up to the amount of offset). By retaining the disputed portion of the Cash Fund, the receiver will have the right of offset in the event CMA is successful in this position.

In addition to the offset, CMA has taken a dangerous position in connection with funds in its possession. In his Order (not the Recommendation) entered on December 14, 2005, Magistrate Judge Schlatter entered the following Order:

> 6.a. First, CMA is cautioned not to release any money from the Assignment for Benefit of Creditors until this issue [the receiver's investigation] is resolved.

---

CMA could get with and without the burdens of the Settlement Agreement was significant.

9

CMA has claimed that it is not bound by the Order that it not release any money from the ABC pending the determination of the receiver's claims against CMA. The receiver is informed and believes that CMA has disregarded this Order, and has released money from the Assignment Estates. This jeopardizes the receiver's claims against CMA, and provides justification for the Court to hold the disputed portion of the Cash Fund until damages and restitution from CMA have finally been determined. Offset under the disputed portion of the Cash Fund is not a worthy substitute for CMA complying with the Order, but it is a start.

CMA's argument overlooks the two important facts. First, it has entered an appearance in this case and is therefore bound by Court Orders in it. Second, the restitution to the receiver is not subject to the cents on the dollar reduction, for the reasons set out above.

## IV.     Resolution of the Narrow Issue Before the Court

Contrary to CMA's position, the disputed portion of the Cash Fund is directly related to the breach of the Settlement Agreement. The Court is within its power to resolve the breach of Settlement Agreement issue based upon these pleadings and prior pleadings. A determination of total breach or repudiation would resolve most of the issues in the 1573.[7] In addition, a determination of breach of the Settlement Agreement would enable the receiver to proceed with its case against CMA for restitution and, in the alternative, damages.

Because of the right and possible need to offset, the disputed portion of the Cash Fund should be paid to the receiver. This way it will be safe until this Court resolves all disputes.

WHEREFORE, Sterling Consulting Corporation, as receiver, prays that this court enter

---

[7] Contemporaneously with this brief, Sterling is filing a Motion for Summary Judgment in the 1773 action.

10

an order that the disputed portion of the cash fund ($25,000) should be paid to the receiver, the

Court should find a breach of the Settlement Agreement by CMA and the Indian Entitites, and

grant the receiver such and further relief as the court deems just and proper.

Respectfully submitted this 24th July, 2006.

Respectfully submitted,

By: *s/ John M. Tanner*
Fairfield and Woods, P.C.
1700 Lincoln Street, Suite 2400
Denver, CO 80203-4524
Phone: (303) 830-2400
Fax: (303) 830-1033
Email: jtanner@fwlaw.com

Attorney for Plaintiff Sterling Consulting
Corporation, as receiver

11

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses or as indicated below or by United States Mail, postage prepaid:

**VIA CM/ECF TO:**

Alan Lemont Hale Esq.
Hale Friesen, LLP
1430 Wynkoop St., Ste. 300
Denver, CO 80202
**Attorney for Richard Basciani, N. Rooke Everill, Pres./Everill Bros., Inc., John H. Nicholson or Virginia A. Nicholson**
ahale@haldfriesen.com

Edward T. Ramey, Esq.
Stuart H. Pack, Esq.
Isaacson Rosenbaum
  Woods and Levy
633 17th St., Ste. 2200
Denver, CO 80202
**Attorneys for William R. Childs, Scott McCormick, Jr., Douglas Walliser, Ronald Schiff, Edward Pacelli, Morty Lempel, A.B. Goldberg, First Entertainment, Harvey Rosenberg**
eramey@ir-law.com
spack@ir-law.com

James R. Cage, Esq.
Cage Williams Abelman
  & Layden, P.C.
St. Elmo Bldg.
1433 17th St.
Denver, CO 80202-1273
**Attorney for Carl D. Lucci/Albert R. Lucci**
jcage@cagewilliams.com

J. Eric Ellliff, Esq.
Kristen Taylor-Randall, Esq.
Morrison & Foerster, LLP
370 17th St., Ste. 3550
Denver, CO 80203
**Attorney for IMCOA**
jelliff@mofo.com

Adam F. Hulbig
Trial Attorney, Tax Division
US Dept. of Justice
PO Box 683
Ben Franklin Station
Washington, DC 20044
**Attorney for United States of America**
adam.f.hulbig@usdoj.gov

Gary C. Moschetti, Esq.
Hatch & Moschetti, LLP
1800 Glenarm Pl., 9th Floor
Denver, CO 80202
**Attorney for Edward Leal**
gmoschetti@hatchlawyers.com

Cassandra Sasso, Esq.
Baker & Hostetler
303 E. 17th Ave., Ste. 1100
Denver, CO 80203-1264
**Attorney for Michelle Lean**
csasso@bakerlaw.com

Michael J. Pankow
Daniel J. Garfield
Brownstein Hyatt & Farber PC
410 17th Street, Suite 2200
Denver, CO 80202
**Attorneys for Michael Payne**
mpankow@bhf-law.com
dgarfield@bhf-law.com

**VIA UNITED STATES MAIL:**
James Duberg, Esq.
727 Third Ave.
Chula Vista, CA 91910-5803

Mark S. Schmidt, Esq.
Miller Simon & Maier, S.C.
788 North Jefferson Street
Milwaukee, WI 53202
**Attorney for Miller Simon & Maier**

Peter C. Freeman, Esq.
Law Offices of Peter C. Freeman
16485 Laguna Canyon Rd., Ste. 230
Irvine, CA 92618-3846
**Attorney for Scott Kajiya**

Mr. Albert Lucci
1930 Wyoming Ave.
Fort Pierce, FL 34982
Robert W. Hallock, Esq.
202 S. Merrill St.
Park Ridge, IL 60068-4223

Peter Sklarew, Esq.
Assistant Chief
Civil Trial Section, Northern Region
United States Dept. of Justice
Tax Division
PO Box 55
Washington, D.C. 20044
**Attorney for IRS**

Robert J. Danie, Eq.
9 Wagon Wheel Drive
Feeding Hills, MA 01030

Noreene C. Stehlik, Esq.
U.S. Dept. of Justice
PO Box 683
Ben Franklin Station
Washington, D.C. 20044
**Attorney for IRS**

Robert L. Morrow, Jr., MD
401 N. College Rd., #5
Lafayette, LA 70506
Nicholas A. Russo, Sr.
310 Extonville Road
Allentown, NJ 08501

Richard J. Cortesi
5316 Camino Montano, N.E.
Albuquerque, NM 87111

Albert R. Gazza
589 Manchester
E. Glastonbury, CT 06025-0085

Ronald Fulfer
15315 S. Francis Dr.
Plainfield, IL 60544

Richard Dale Wood
13997 80th Ave. North
Maple Grove, MN 55311

Steve Halprin
1316 Penningtow Place
Concord, N.C. 28207

Alf Iseback
Gamla Tuvevagen 4
41705 Goteborg
**SWEDEN**

Kathryn L. Troccoli
1911 Champlain St.
Ottawa,IL 61350

Ed Pink
Ed Pink Racing Engines, Inc.
14612 Raymer Street
Van Nuys, CA 91405

Montgomery & Andrews, P.A.
325 Paseo De Peralta
Santa Fe, NM 87501

John Inelli
17 Old Farmstead Rd.
Chester, NJ  07930

Eller Industries
c/o Leonard S. ("Lonnie") Labraiola
6035 N. 115th Street
Longmont, CO  80504-8434

**Registered Agent:**
Randal L. Hittle
1630 Main Street, Suite 202
Longmont, CO  80501

**VIA E-MAIL:**
Richard A. Block
President
Sterling Consulting Corporation
4101 E. Louisiana Ave., Ste. 300
Denver, CO  80246
**Receiver**
rblock@xpn.com

**Courtesy Copies to:**
Julie Trent
jt@bsblawyers.com

Eugene Sprague
esprague@bw-legal.com

Michael Chodos
michael@chodos.com

Robert Pitts
rpitts@lawrwp.com

By:  *s/ John M. Tanner*
         Fairfield and Woods, P.C.
         1700 Lincoln St., #2400
         Denver, CO  80203
         Phone:  (303) 830-2400
         Fax:  (303) 830-1033
         Email:  jtanner@fwlaw.com