**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  95-cv-0777-ZLW-OES

In re:  THE RECEIVERSHIP ESTATE OF INDIAN MOTORCYCLE MANUFACTURING, INC.

**ASSIGNEE'S OPENING BRIEF RE:  CASH FUND DISPUTE**

COMES NOW Credit Managers Association of California, dba Business Credit Services ("Assignee" or "CMA") as Assignee, pursuant to California Assignments for the Benefit of Creditors and General Assignments (the "ABCs") by Indian Motorcycle Company ("Indian"), Indian Motorcycle Corporation, Indian Motorcycle Real Estate Services, Inc., IMCOA Licensing America, Inc. ("IMCOA Licensing"), and IMCOA Holdings America, Inc. ("IMCOA Holdings"), and submits this Opening Brief regarding the Cash Fund Dispute.

As grounds, the Assignee states as follows:

**Factual Background**

1.     On or about August 31, 2000, Sterling Consulting Corporation, in its capacity as receiver in this action ("Receiver") and in its individual capacity ("Sterling"), entered into a Settlement Agreement ("SA") and an Indemnification Agreement ("IA")(collectively, the "Agreements") with Indian, IMCOA Licensing and IMCOA Holdings ("Indian Entities").  The Agreements are attached hereto as Exhibits A and B, respectively.[1]

2.     The Agreements provided, *inter alia*, for:  (i) a settlement of all issues between the Receivership Estate and the Indian Entities, including a dismissal of the Indian Entities from the Receivership Action, *with prejudice*, and mutual releases.  *See* SA §§ 2.1.c and 2.9; (ii) a

---

[1] All capitalized terms not otherwise defined herein are as defined in the Agreements.

cash payment to the Receiver and Fairfield & Woods, the Receiver's counsel, in the aggregate amount of $350,000, in full and final satisfaction of specified monetary obligations, as well as "[a]ny and all other obligations past, present or future to reimburse, compensate, bonus, gift or otherwise pay Sterling or the Receiver for any obligation . . . whatsoever, except as specifically set forth in [the Agreements] and the Release Agreement." *Id.* § 2.5 and, in particular, § 2.5.d; (iii) tender of Stock Options both to the Receiver and to Sterling, in its individual capacity. *Id.* §§ 2.6 and 2.7; (iv) entry into the IA, which was attached as an exhibit to the SA. *Id.* §2.8; (v) the termination of what was described as the "Investigation" by the Receiver relating to, inter alia, "dealer matters and common stock matters." *Id.* § 2.4; and (vi) the Receiver and Sterling agreed to "forever refrain from attacking the trademark rights of Indian" and/or from assisting, in any way, any other entity from doing so. *Id.* §§ 3.4.a and 3.4.b. All of the foregoing was fully performed by the parties; the Indian Entities were dismissed with prejudice from the Receivership Estate, the cash was paid, the Stock Options were tendered, the IA was executed, the Investigation was terminated, and the Receiver and Sterling refrained from attacking the Indian trademarks. The only unperformed acts related to the parties' obligations under the IA.

       3.       The purpose of the IA was to address the Receiver's "continuing participation in certain ongoing litigation involving Indian . . . and also future claims that may be brought against [the parties]." *See* IA, Recital F. The IA provided that in exchange for the Receiver's and Sterling's cooperation with respect to various aspects of the potential future litigation (e.g., responding to discovery requests or third party subpoenas), the Receiver and Sterling would be indemnified with respect to certain specified Claims Losses (defined in § 1.1.c) throughout the term of the IA, which ended December 31, 2005 (but which indemnity obligations continued thereafter for those Claims "made before that time [i.e., December 31, 2005] and arising from

specific facts and circumstances arising before that time"). *See* IA § 2.1. The IA specified how the Indemnified Party (either Sterling or the Receiver) was to proceed with respect to "Demands" (§ 3.1), "Requests" (§ 4.1), and "Claims" (§ 5.1), but in each case the Indemnified Party was required to provide notice to the Indian Entities of such Demand, Request or Claim and, if a Loss was incurred, to promptly provide the Indian Entities with a demand for reimbursement for such Demand Loss (§ 3.4) or Claim Loss (§ 5.5) (there was no provision for reimbursement of a "Request" loss). Any request for reimbursement of a Demand Loss or a Claim Loss was to be made within 30 days, but in no event longer than 90 days, *at the latest*, from the date of incurrence of such Loss. *See* § 3.4.b and § 5.5.b, respectively. Thus, the absolute latest date any claim for reimbursement could have been made under the IA was March 31, 2006, which date is 90 days after the termination of the IA.[2]

### The Cash Fund

4. In order to provide surety for payment of Claim Losses (as opposed to Demand Losses), the IA established a Cash Fund "to ensure the prompt payment of all Claims Losses" asserted by any Indemnified Party under the IA. *See* IA §§ 5.12-5.14. The Cash Fund was established by Indian's transfer of $50,000 to Fairfield & Woods, P.C. ("Fund Agent"), to hold in trust. Section 5.13 of the IA provided:

> **If Indian shall be in default** of its obligations to Indemnify an Indemnified Person hereunder **with respect to** Receiver's Fees, Receiver's Expenses, Receiver's Legal Fees, Sterling's Fees, Sterling's Expenses or Sterling's Legal Fees **in respect of any Claim**, the Indemnified Person may, at its option, give notice in writing to the Fund Agent **specifying the amount due and payable** and the Fund Agent shall promptly pay the **said amount** demanded from the funds available in the Cash Fund.

---

[2] A reimbursement request relating to a Claim that survived the termination of the IA would need to be submitted within 90 of its incurrence, regardless of the termination date. However, because no pending Claim for Indemnification was made by any Indemnified Party prior to December 31, 2005, no Claim survived the termination of the IA.

00047114                                3

*Id*. § 5.13 (emphasis added).

5. Any amount in the Cash Fund not otherwise paid out pursuant to the provisions of § 5.13 of the IA "shall be paid by the Fund Agent **on January 1, 2006** one half to Indian [currently CMA, as Assignee] and one half to Sterling." *Id.* § 5.14 (emphasis added).[3] Thus, one half of the Cash Fund (including one-half of all accrued interest) is an asset of the Indian Entities, subject to protection, administration and disbursement to the Indian Entities' creditors by the Assignee, and should have been paid to the Assignee on January 1, 2006.

6. With respect to the "other," allegedly undisputed, half of the Cash Fund, this Court, as the Receivership Court, should examine the disbursement of such funds. It is clear that (i) the Cash Fund was specifically dedicated to act as a surety for "Claims Losses" and (ii) Sterling was not entitled to indemnity for "Claims Losses" until after the termination of the Receivership (which termination has not occurred) *Id.* § 5.10. Although the language in § 5.13 presumes that the Receivership would have been terminated prior to December 31, 2005 and thus states that Sterling, in its individual corporate capacity, is to receive one-half of the residue of the Cash Fund, such a result is incongruent with the intent of the agreement. Given the purpose of the Cash Fund and the current status of the Receivership, the appropriate party to receive the benefit of the surety (i.e., the one-half of the residue of the Cash Fund) is the Receiver, as that is the only Indemnified Party that was ever entitled to the benefit of the surety. The Assignee's issue with respect to this half of the Cash Fund is simple: the Assignee does not wish to be subject to claims by the Receivership Claimants that the Assignee received "their" half of the

---

[3] On May 12, 2004, approximately 3½ years after the Agreements were negotiated and executed, the three Indian Entities assigned all of their respective property to the Assignee pursuant to three California Assignments for the Benefit of Creditors ("Assignments"). Pursuant to the Assignments, the Assignee is authorized to "receive the said property [and] conduct the said business" of the Indian Entities, pay "the creditors of [the Indian Entities]," and incur and be reimbursed for expenses relating to "the operation, management, preservation or administration of the property of the Assignment." *See generally,* Indian Entities' Assignments for Benefit of Creditors, pp. 1-2, attached as Exhibit C.

Cash Fund.  Exacerbating this concern is the Receiver/Sterling's seemingly unchecked transfer of claims between the Receiver and Sterling (including a "claim" to Indian's half of the Cash Fund) and the Receiver/Sterling's refusal to provide this Court or the Assignee with the assignment documents by which the purported "assignment" of one-half of the Cash Fund occurred, notwithstanding repeated requests therefore.  *See* Exhibit D, Correspondence between R. Pitts and counsel for the Receiver and Sterling dated July 12, 14, 17-19, 2006.[4]

### The Basis of Sterling's "Claim"

7. Contrary to the clear and unambiguous terms of the IA, Sterling made demand on the Fund Agent that the *entire* Cash Fund be paid to Sterling, pursuant to its letter of October 13, 2005, attached as Exhibit E ("Demand Letter").[5]  The Assignee immediately objected to Sterling's demand by asserting, *inter alia*, that "Indian was not in default of its obligations to Indemnify" pursuant to the terms of the IA, as no Claim had been received from Sterling that had not previously been paid.  *See* Exhibit F, Correspondence between R. Pitts and J. Tanner, dated October 13, 17, 22 and 25, 2005.

8. Sterling does not assert that there are any unpaid Claims Losses.  Rather, Sterling asserts that the Assignee (and/or Indian) materially breached the Agreements by failing to require Indian Motorcycle International, LLC ("IMI"), a third-party purchaser, to assume the obligations of the Agreements.[6]  This allegation of a material breach has been repeated by the Receiver and by Sterling ever since in both this Receivership and the currently pending 05-1573

---

[4] On July 24, 2006, during the final preparation of this Brief, the Receiver filed what purports to be a "Notice of Terms of Assignment."  Such filing raises more questions than it answers and actually highlights the existence of conflicts of interest between the receivership estate and Sterling.

[5] Once the January 1, 2006 distribution date had passed without the assertion of any unpaid Claim Loss against the Cash Fund, the Assignee, on behalf of Indian, made its own demand for turnover of *one-half* of the Cash Fund.  *See* Letter of Robert W. Pitts dated January 3, 2006, attached as Exhibit G.

[6] IMI purchased the Indian trademark and related intellectual property from the Assignee in July of 2004.

action. The Demand Letter also alludes to another material breach, that the Assignee (or Indian) "could not possibly be 'aggressively prosecuting its obligations under paragraph 5.2' [of the IA]". *See* Exhibit E, page 2. Neither of these alleged breaches are material breaches, as more fully discussed below.

9. As an initial threshold issue, for the reasons stated below, the existence of any breach is irrelevant to this Court's determination of the Cash Fund dispute. Thus, the Court need not address any issue other than: did Indian (or the Assignee) fail to pay an Indemnified Party for any Claim Loss submitted under the terms of the IA, and, if so, is the Indemnified Party entitled to recourse to the Cash Fund for such unpaid claim?

10. A second threshold issue, however, is the lack of any basis for Sterling's demand for payment of the *entire* Cash Fund for three separate reasons. **First**, there is no language in the IA that provides for what, in essence, Sterling has demanded: a forfeiture of the Cash Fund as a penalty for a breach (even assuming there was a breach, which the Assignee disputes). The Cash Fund provisions in the IA are clear: the Cash Fund was to operate as a surety for *specific defaults with respect to payment of Claim Losses*, not as a forfeiture penalty. **Second**, the Demand Letter fails to even facially comply with the requirements of the IA that any such demand "specify[] the amount due and payable" in respect of any Claim *See* IA, § 5.13. Far from being a mere procedural technicality, Sterling's failure to state the amount due (and the basis for such amount due, i.e., failure to pay a Claim Loss) highlights the entire issue: THERE IS NOT A SINGLE CLAIM LOSS THAT HAS NOT BEEN PAID. There have been no unpaid Claim Losses pursuant to the IA submitted to the Indian Entities or to the Assignee.[7] Further, as

---

[7] Despite numerous requests that Sterling provide the Assignee with evidence of any Claim under the IA, *see* Exhibit G, Letters of October 17 and 25, 2005, neither Sterling, the Receiver, nor the Fund Agent, for that matter, has notified the Assignee of any un-reimbursed Claims as required by § 5.13 of the IA and, to date, the Assignee is unaware of any outstanding or unpaid Claim(s).

00047114                                6

discussed above in Paragraph 3, the time period for submitting any reimbursement for any Claim (a Claim Loss or otherwise) has long since passed. **Third**, inasmuch as the Cash Fund was intended as a surety for unpaid Claim Losses, *see* IA § 5.13, Sterling should not be entitled to any portion of the Cash Fund because it is not entitled to assert a Claim Loss until after the termination of the Receivership.[8] *Id.* § 5.10. The failure of payment of a Claim Loss submitted pursuant to the terms of the IA does not, and cannot, form any basis for Sterling's demand for turnover of the Cash Fund because no such "failure" exists.

## The Alleged Trademark Breach

11.  Despite the clear and unambiguous language of the IA with respect to the purpose and disbursement of the Cash Fund, Sterling appears to demand the entirety of the Cash Fund based not on an unpaid "Claim Loss," but rather on a claim that Indian/the Assignee materially breached the Agreements by failing to require IMI to assume the IA obligations. Section 6.12 of the IA provides that Indian may assign the Indian related trademark and, if it does, then "Indian shall require the assignee [of the Indian related trademark] to assume the obligations [under the IA]." It is undisputed that the Indian related trademark was assigned to IMI without requiring IMI to assume the obligations of the IA. While the Assignee has always acknowledged that IMI did not assume the obligations under the IA, the Assignee disputes that the failure of IMI to do so constitutes a material breach or has damaged any party to the IA or the SA.

---

[8] While this issue is relevant to the lack of any Claim Loss by Sterling, it is also indicative of a systemic and significant conflict in this Receivership. It is clear that, at the time of the Demand Letter, the Receiver was the sole beneficiary of the "surety" aspect of the Cash Fund as it was the only party entitled to assert a Claim Loss. Yet Sterling, with the Receiver's acquiescence, demanded for itself, in its individual corporate capacity, the entirety of the Cash Fund, potentially leaving the Receivership high and dry for a Claim Loss that it might have asserted between October 13, 2005 and December 31, 2005, when the indemnity obligations terminated. This concern over conflicts between Sterling and the Receiver is heightened by the Receiver and Sterling's refusal to provide the assignment documents described above.

12. It is critical to note that IMI's failure to assume the IA in no way obviated the indemnity obligations of Indian and the Assignee under the IA. The essence of the IA was the indemnification of the Receiver or Sterling with respect to specified claims. There was no failure of performance with respect to this "essence of the IA," as the Receiver and Sterling received every indemnification right to which they were entitled.[9] What the Receiver and Sterling did NOT receive (due to IMI's failure to assume the IA obligations), is an additional third party – i.e., IMI – from which to extract additional concessions/monies. The Receiver and Sterling *may* have had an argument for a claim *if* there was an indemnification claim made that Indian and/or the Assignee failed to satisfy *and* such failure was as a result of IMI not assuming the IA obligations. However, such is not the case and, given the expiration of the term of the IA, such will never be the case. Therefore, IMI's failure to assume the IA obligations cannot form the basis of any claim of breach of the IA.[10] Further, it cannot form the basis of any claim of breach of the SA as the provisions of the SA had been fully executed by that time.

### The Alleged Prosecution Breach

13. In the Demand Letter, Sterling also alludes to a breach relating to the second sentence of § 5.13 of the IA, which provides:

> For purpose of this paragraph 5.13, Indian shall be deemed to be in default if a Claim has been made in any court and Indian is not aggressively prosecuting all of its obligations under paragraph 5.2 [of the IA].

---

[9] This point also relates to the penultimate sentence in § 6.12 of the IA: "Notwithstanding anything herein to the contrary, Indian shall not execute an assignment that defeats the intent of this [IA]." Thus, the intent of the IA (i.e., to indemnify certain parties for certain claims) was not defeated by the assignment to IMI.

[10] The Assignee's position is buttressed by the fact that Sterling has admitted, in the Scheduling Order filed in the 05-1573 Action [Docket No. 37], that it has suffered no damages as the result of any alleged breach. *See* Scheduling Order, § 4. In addition, Sterling's Initial Disclosures Pursuant to Rule 26(a) state that the damages computation to be provided under Rule 26(a)(1)(C) is "Not applicable." *See* Plaintiff's Initial Disclosures, attached hereto as Exhibit H.

Paragraph 5.2 of the IA delineates Indian's obligations "upon receiving notification of a Claim from any Indemnified Party." Because neither Indian nor the Assignee ever received notification of a Claim for which it was required to "prosecute" anything, neither Indian nor the Assignee could have breached its obligation under § 5.2.[11] Further, there is no basis for an anticipatory breach with respect to the § 5.2 obligations in that the Assignee was ready, willing and able to satisfy the § 5.2 obligations and there has been no showing to the contrary.

## The Materiality of the Alleged Breach

14. Because the Cash Fund was not created as a penalty for any and all breaches, but rather was a surety for a specific performance requirement (which was performed), the resolution of the Cash Fund dispute does not require the Court to address the Receiver/Sterling's breach allegations. However, even if this Court deems the allegations of the alleged breaches to be relevant, it should find that such breaches are legally non-material under Colorado law.

15. "A material term goes to the root of the matter or essence of the contract." *Coors v. Security Life of Denver Ins. Co.*, 112 P.3d 59, 64 (Colo. 2005). "Whether there has been a material breach of contract turns upon the importance or seriousness of the breach and the likelihood that the injured party nonetheless received . . . substantial performance under the contract." *Interbank Investments, LLC v. Vail Valley Consolidated Water Dist.*, 12 P.3d 1224, 1228 (Colo. App. 2000). In *Interbank Investments*, a developer contracted to build water systems and provide documentation regarding such systems to the Water District. The developer completed the water systems; however, the required documentation was not provided to the District. The court held that "the developer had performed the essence of the agreements, *i.e*., building the water systems and turning them over to the water districts to operate." *Id.* at 1229.

---

[11] Indian probably did receive notice of Claims prior to the Assignee's involvement, but there has never been an allegation that Indian failed in any of its § 5.2 obligations regarding any of these former Claims.

00047114                                    9

"While the non-production of [documentation] was not wholly insignificant, this did not obstruct the water districts' use of the water systems." *Id.* Moreover, "the water districts failed to show how they were damaged [by the non-production of the documentation]." *Id.*

16. In this case, the intent of the Agreements was to provide indemnification to the Receiver (or Sterling, post-receivership) for certain specified Losses. *It is undisputed that all such Claims have been paid* and the party claiming indemnification (be it Sterling or the Receiver) has received ALL of the benefits of the Agreements. Moreover, no party has been damaged by IMI's failure to assume the Agreements, a fact explicitly admitted by Sterling. *See* footnote 10 and Exhibit H. Finally, the term of the IA (and the indemnification obligations), expired December 31, 2005, ensuring that that there has not been – and never will be – any failure of performance in the indemnification of any Indemnified Party. Without such failure, there cannot be a material breach of the IA or the SA as alleged by the Receiver and/or Sterling.

WHEREFORE, the Assignee requests that this Court order that one-half of the Cash Fund (including accrued interest) be paid immediately by the Fund Agent to the Assignee.

Respectfully submitted this 24th day of July, 2006.

| BIEGING SHAPIRO & BURRUS LLP | LAW OFFICE OF ROBERT W. PITTS |
|---|---|
| By:   s/ Julie Trent   | |
| Julie Trent, No. 17086 | Robert Pitts 4582 S. Ulster Street Pkwy., |
| Suite 1650 | 660 Newport Center Drive, Suite 400 |
| Denver, CO  80237 | Newport Beach, California 92660 |
| Office:  (720) 488-0220 | Office:  949-720-4125 |
| Fax:  (720) 488-7711 | Fax:  949-720-4111 |
| E-mail: jtrent@bsblawyers.com | E-mail:  rpitts@lawrwp.com |

*Attorneys for CMA as Assignee of the Indian Entities*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 24th 2006, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the parties who have entered a CM/ECF appearance in this matter.

And by facsimile number to the following:

| | |
|---|---|
| Michael E. Chodos, Esq.<br>Michael E. Chodos, Attorney at Law<br>56 Malaga Cove Plaza<br>Palos Verdes Estates, CA 90274 | Fax:     310.791.1958 |
| Tom Quinn, Esq.<br>1600 Broadway, Suite 1675<br>Denver, CO  80202 | Fax:     303.672.8281 |

　　　　　　　　　　　　　　　　　　s/ Julie Trent
**Julie Trent**, No. 17086
Bieging Shapiro & Burrus, LLP
4582 South Ulster Street Parkway, Suite 1650
Denver, Colorado 80237
Telephone:  (720) 488-0220
Fax: (720) 488-7711
E-mail:  jtrent@bsblawyers.com

00047114                        11