UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

**Civil Action No. 95-cv-00777-REB-CBS**

In re:

Receivership Estate of INDIAN MOTORCYCLE MANUFACTURING, INC.,
a New Mexico Corporation

_____

**United States' Reply to Objections of Audax (DI# 2702) and CMA (DI# 2712)
to Receiver's Motion to Terminate Receivership and
Assign Remaining Claims to the United States and Sterling (DI# 2674)**
_____

The Receiver has moved to terminate the receivership action and for related relief, which includes the assignment of remaining assets jointly to the United States and Sterling Consulting Corporation (in its ordinary corporate capacity) ["Sterling"].  *See Motion to Approve Receiver's Forty-First and Final Report and to Discharge Receiver* (DI# 2674) ["Termination Motion"].  The Termination Motion states it was authorized to represent that the United States "has no objection and believes the motion should be granted."  Objections to certain particular aspects of the relief sought in the Termination Motion have been filed, first by a group of investment funds referred to in the objection as "Audax" (DI# 2702), and later "joined" by Credit Managers Association of California, dba CMA Business Credit Services ("CMA"), purporting to limit that joinder to CMA's capacity "as Assignee, pursuant to a California Assignment for the Benefit of Creditors and General Assignments by Indian Motorcycle Company, IMCOA Licensing America, Inc., IMCOA Holdings America, Inc., Indian Motorcycle Corporation, and Indian Motorcycle Real Estate Services, Inc.1 (collectively referred to herein as the 'Indian Entities')."  (DI# 2712.) The gist of the objections are (1) that it is improper to approve any assignment of any part of the remaining receivership estate assets to Sterling, including the claims for restitution previously

granted to enable recovery of excessive distributions so that administrative taxes of the receivership estate may be paid; (2) that it is particularly inappropriate to approve the assignment of stock in Indian Motorcycle Company (the parent of the other Indian Entities) that was provided to the receivership estate in connection with its sale of trademarks and other assets to the Indian Entities; and (3) that the Termination Motion neglects to mention an outstanding asset of the estate that would also be assigned – an "Amended Complaint" against CMA and Audax filed in this matter in July 2006 (DI# 2306) that remains the subject of a pending show-cause order (DI# 2312) – and that it is similarly inappropriate to approve an assignment of that pleading or the causes of action it recites, or any related causes of action the Receiver may have against CMA or Audax.

The United States files this reply in order (1) to explain its interest in the issues raised by the objections, (2) to explain that there is nothing wrong with assigning assets to a person or entity that acted as a receiver when that person or entity has unpaid administrative claims against the receivership estate, and further that the assignments proposed are especially appropriate in the unique circumstances of this case where the Court has previously approved a settlement agreement that gives the United States and Sterling (and its attorneys) a joint interest in certain recoveries (including any recovery in any successful litigation against CMA or Audax); (3) to apologize for having overlooked, when reviewing and proposing changes to the Termination Motion, the pendency of the show cause matter relating to the Receiver's "Amended Complaint" against CMA and Audax, in respect to which the United States filed a response in August 2006; and (4) to make various proposals as to what should now be done about the "Amended Complaint" in connection with the Termination Motion (and why).  We repeatedly place "Amended Complaint" in quotes because, as described below, we think it should be viewed as a lawful ancillary complaint of the kind common in equity receivership cases, and suggest that it be assigned a separate new cause number and allowed to survive the termination of Case No. 95-cv-777, because making the

Receiver, or Sterling, file a brand new complaint risks exposure to a possible statute of limitations defense that did not exist when the "Amended Complaint" was filed in 2006.  Preliminarily, in August 2006, the United States filed the *United States' Position on Receiver's Response (DI# 2328) to Order to Show Cause (DI# 2312)* (DI# 2356) ["U.S. Show Cause Response"], a copy of which is made an exhibit hereto for convenience, which explained then why the Amended Complaint should be viewed as an ancillary complaint and perhaps be given a new cause number at that time.

### Background; and Nature of Claims in "Amended Complaint"

As the 41st Report and the Termination Motion together explain, in 1999, the Receiver closed on a sale of the assets of the receivership estate (and those of the Massachusetts bankruptcy estates), the most valuable of which were trademarks and trademark rights, to the Indian Entities, for approximately $18 million in cash and $2.25 million worth of stock in the new Indian Motorcycle Company ("IMC"), which was the parent of the other Indian Entities identified in the Audax and CMA objectitons.  The transactions were complex and involved multiple agreements.  Litigation soon thereafter erupted between the Receiver and the Indian Entities and was settled in or after August of 2000 (including a cash payment of $350,000 to the receivership estate).  The settlement again involved complex and lengthy agreements (some of which are at issue in the "Amended Complaint") which included reservation of substantial stock rights to the receivership estate.

After that, although counsel for the United States is not as conversant with the facts as the Receiver or its counsel, according to the "Amended Complaint" (as explicated further by the Receiver to government counsel), several things may have occurred that would cause the receivership estate to have new claims against the Indian Entities and/or Audax.  First, notwithstanding nominal restrictions on stock transfers, insiders were being permitted to sell their stock while stock transfers by the Receiver on behalf of the receivership estate were blocked.

Indian then ran into major financial difficulties and Audax substantially increased it investment in exchange for additional preferred stock, all series of which had a preference in liquidation and distribution far in excess of its cash infusion amount (thus devaluing the common stock more than would normally occur on a dollar per dollar basis), at which point trading in the common stock ceased.  It is our further understanding that at a still later time when the Indian Motorcycle Corporation ("Corporation") was severely stressed and facing imminent liquidation, Audax then invested a smaller sum (approximately $11 million according to the Receiver) as a secured loan. Although the loan was only to Corporation, the loan was cross-collateralized by the assets of Corporation's sister entities.  According to the "Amended Complaint," IMC was "controlled" by Audax at this point as a result of Audax's prior investment(s).  The Amended Complaint thus maintains that improprieties by Audax during its control of the Indian Entities helped cause the stock in IMC that was held by the receivership estate to become worthless, and that it and the Indian Entities tortiously interfered with a contract of the Receiver to sell the stock.  (*See* Second and Seventh Claims for Relief in Amended Complaint.)

Next, the assignments (to CMA) for the benefit of creditors took place, first for just Corporation and later its sister entities and the parent, IMC, which sold all the assets.  After sale of hard assets (which included real estate and other hard assets acquired by the Indian Entities after their purchase of assets from the receivership estate), CMA sold the intellectual property (trademark rights) for about $2.5 million.  One of the more significant claims in the "Amended Complaint" is that it was improper for CMA to sell the assets of the sister entities of the primary indebted company, Corporation, to pay its debts.  (Third and Fourth Claims for Relief in "Amended Complaint.")  Although at first blush that theory might not seem intuitively logical, since Audax had cross-collateralizations against all the entities' assets and thus had a right to recover its claim from all of them, there may well be more here than meets the eye if, for example,

as the Receiver seems to believe, Audax made the loan, knowing that liquidation was imminent, in order to be able to foreclose and acquire the assets of the all of the Indian Entities for less than full value, given that Audax's preferred stock position was behind even unsecured creditors.  In this regard, the "Amended Complaint" further alleges that CMA originally believed that it had a cause of action to subordinate Audax's insider secured loan claim, but then suddenly agreed to sell all the assets and distribute all the net proceeds to Audax.[1]

The Receiver also seems to believe that CMA sold the assets to Stellican for far less than they were worth, and that Audax may have an indirect interest.  It does seem at least odd that all the intellectual property assets, including the trademark rights, were sold free and clear for (according to the Receiver) only about $2.5 million in 2003, when the Receiver had sold them three years earlier for about $20 million, and also given that substantial sums had been invested in legal work to perfect and gain more complete control over the trademarks in the meantime (*i.e.*, after the Receiver's 1999 sale and before CMA's 2003 sale).  The Receiver seems to suspect that Audax has an indirect undisclosed interest in Stellican or a related entity now in control of the trademark assets (which, if true, would certainly be grounds for questioning the propriety of the

---

[1] It is well established that courts of equity may equitably subordinate the secured claims of insiders under certain circumstances.  *See Pepper v. Litton*, 308 U.S. 295 (1939).  This happens frequently in bankruptcy cases and is available in other insolvency proceedings, including receiverships and presumably also proceedings respecting assignments for the benefit of creditors, which are a loose form of receivership in substance, albeit apparently not subject to continuous court supervision (and thus perhaps more susceptible to manipulation by insiders or certain other kinds of creditors).  *See, e.g.*, *Matter of Mobile Steel Co.*, 563 F.2d 692, 699-700 (5th Cir.1977) (bankruptcy case); *U.S. v. Colorado Invesco, Inc.*, 902 F.Supp. 1339, 1343-45 (D.Colo.1995); *Depan, Eichenberger & Knowles Inc. v. Greenbriar Properties I*, 200 A.D.2d 937, 607 N.Y.S.2d 177 (A.D. 3 Dept. 1994); *First Heights Bank, FSB v. Gutierrez*, 852 S.W.2d 596, 609 (Tex.App. 1993); *Peoples Fed. Sav. & Loan Ass'n v. Myrtle Beach Golf & Yacht Club*, 310 S.C. 132, 149-50, 425 S.E.2d 764, 774-75 (S.C.App.1992); *In re Mader's Store for Men, Inc.*, 77 Wis.2d 578, 600-01, 254 N.W.2d 171, 184-85  (Wis. 1977).

.

sale to Stellican).  Moreover, the Receiver maintains that it had offered to drop its claims in that regard if knowledgable officers of CMA, Audax, and Stellican each provided sworn affidavits that there was no such undisclosed or indirect interest of Audax in Stellican or in any entity to which Stellican may have transferred the trademark assets, but that those entities have indicated no interest in dispelling the Receiver's suspicions in that manner.

While the foregoing is a sketch of the most significant claims in the "Amended Complaint," it also includes a claim that the Indian Entities agreed in the August 2000 settlement with the Receiver to certain indemnification obligations to Sterling and further agreed that the Indian Entities would not assign the trademark assets without requiring the assignee to accept the obligations in the indemnity agreement.  Yet Stellican ended up with the trademark assets without the indemnity obligations.  The "Amended Complaint" therefore claims that the assets were more valuable sold shorn of the obligations than they would have been accompanied by the obligations and that the "marginal difference" constitutes unjust enrichment to CMA as Assignee which should be required to disgorge that sum to the receivership estate since Sterling assigned its rights to the estate in that regard.  (First Claim for Relief in Amended Complaint.)

There appears to be no dispute that the agreements contained the provisions claimed by the Receiver and also no dispute that CMA was bound by the provisions as the Indian Entities' assignee.  Further, there is also no dispute that the sale was made without the concomitant obligations.

But, after Sterling (in its ordinary corporate capacity) assigned the unjust enrichment claim to the receivership estate, Sterling sued CMA for a declaratory judgment that CMA's failure to require Stellican to take the obligations with the assets released Sterling from its own obligations under the same contract.  (*See* Civil No. 1:05-cv-1573.)  Magistrate Judge Shaffer ruled against Sterling on the premise that it suffered no damages or that the breach was essentially not material

and, since Sterling's obligations then expired at the end of 2005, it was not entitled to be released from its own obligations, which apparently remained of value to any purchaser of the assets. (*Ibid*, DI# 110, entered 12/12/2006.)  Magistrate Judge Shaffer did not address the assigned unjust enrichment claims of the receivership estate because Sterling only sued for itself and only sought declaratory relief seeking release from its own obligations.[2]  Accordingly, it appears that the unjust enrichment claim may still be viable, although the United States acknowledges some uncertainty in that regard.[3]

The "Amended Complaint" (Sixth Claim for Relief) also asserts a securities fraud claim (insider trading and aiding and abetting the same).

Finally, the last ("Eighth") claim against CMA or Audax in the "Amended Complaint is that Audax, through its domination and control, became the "alter ego" of the Indian Entities and improperly caused them all to encumber their assets to Audax for a loan that was only to Corporation, and then improperly caused CMA to drop a contention that Audax's insider claim ought to be subordinated.

_____

[2] To the extent Magistrate Judge Shaffer's decision in No. 1:05-cv-1573 contains rulings bearing indirectly on one or more of the claims of the receivership estate, it ought not to be binding on the receivership estate since No. 1:05-cv-1573 was not part of the receivership action and did not involve the receivership estate or the Receiver as a party, but rather involved only the claims of Sterling in its ordinary corporate capacity.  Additionally, the Amended Complaint was already pending separately in this case, and Magistrate Judge Shaffer probably could not adjudicate the Receiver's claims against the Indian Entities or their assignees because the settlement agreement explicitly agreed, with this Court's previous approval, that any dispute between the Receiver and the Indian Entities or their assignees, if heard by a magistrate judge, would have to be a magistrate judge that had no prior involvement in the receivership case.  Magistrate Judge Shaffer had apparently already presided over settlement mediation in the receivership case between the Receiver and CMA by the time No. 1:05-cv-1573 was decided.

[3] It appears to the United States that a related claim by Sterling that CMA breached its fiduciary duty by selling the assets without the indemnity obligation (Fifth Claim for Relief in "Amended Complaint") probably died with the *Sterling v. CMA* decision in light of the lack of damages implicitly found in the decision with respect to this particular claim.  But "unjust enrichment" is not necessarily founded on injury to a plaintiff; it is founded on the defendant having been unjustly enriched by avoidance of some obligation.

Finally, there is also an entirely separate claim in the "Amended Complaint" against the Pahl & Gosselin law firm ("P&G") for breach of a trust agreement under which P&G agreed to hold cash deposits for motorcycle purchasers in trust and then later diverted the funds to itself for attorney's fees. This claim is not large. It involves about $27,000 in deposits of which 24.35% would be subject to the restitution recovery for the tax claim and the other 75.65% ought to be refunded to the depositors, some of whom apparently did not receive adequate notice that their deposits had to be reclaimed or P&G was going to treat them as forfeited and divert them.[4]

## I.    United States' Interest in Issues Raised by the Objections

Meanwhile, in 1999 and 2000, the Receiver unfortunately distributed all cash proceeds of the assets sale without reserving funds for a potential administrative tax incurred in the sale, because the Receiver apparently believed there would be no tax liability and, if there was, it thought the tax could be more than covered by an additional $450,000 it was claiming from the bankruptcy estates at the time. The bankruptcy estates, however, incurred their own tax liabilities, and the $450,000 the Receiver claimed ultimately evaporated due to the administrative priority tax claim in the bankruptcy cases. The receivership action was for a time transferred to the District Court in Massachusetts where the government won a judgment for the tax, leaving penalties and payment issues to be resolved.

---

[4] The United States always believed that this claim ought to have been "settled" by having P&G reconstitute the disputed deposits and allow the Receiver to re-notice the depositor claimants to give them a new chance to get their deposits back (with 24.35% of each deposit going toward restitution for the tax claims, since the deposits were made with funds of the receivership estate that otherwise would have been distributed to the depositors on their original claims against IMMI dating from prior to the receivership). P&G at one time seemed amenable to that approach in principle, but the Receiver was reluctant to settle unless it received some part of its attorney's fees because it felt that P&G's conduct in diverting deposits held in trust was unconscionable. The United States later persuaded the Receiver to offer to give up its claims for fees in a settlement, but by that time, the Order to Show Cause had been issued and P&G seemed no longer interested as it stopped answering the government's inquiries. Perhaps it felt that the Order to Show Cause that this Court issued signaled that this Court was likely to dismiss the Receiver's claims against it.

After much heated litigation between the Receiver and the United States, they reached a Settlement Agreement under which tax penalties were waived and the case would be returned to Colorado where the Receiver would seek restitution of 24.35% of each claimant's 1999/2000 distribution.  This was projected to result in collection of an amount at most that would cover the 1999 income tax without *any* interest.  The United States assigned 37% of its tax collection rights to Sterling and the Receiver's counsel, Fairfield and Woods ("F&W"), in a simultaneous settlement of well in excess of $1 million in unpaid claims of Sterling and F&W for compensation and reiumbursement of expenses.  The settlement limited Sterling and F&W to that 37% not only for those compromised past administrative claims, but also the compensation and expenses they might otherwise have claimed for the restitution proceedings.  This reflected the recognition by everyone that every effort should be made to make the situation as fair as possible to the hapless claimants who, while they had received a windfall, had no prior knowledge that they might be liable for restitution.

The tax settlement also recognized that the IMC stock was still in the receivership estate and also that the stock carried with it potential claims against the Indian Entities, the officers thereof, and possibly CMA or Audax.  In that regard, it provided that any proceeds from a sale of the IMC stock or from any lawsuits related to the stock rights would be split 50/50 between the United States and Sterling/F&W, but this time with reasonable litigation expenses to come off the top.  The United States' 50% of any such stock or lawsuit recoveries was not subject to the term of the settlement agreement limiting restitution to the tax principal – in other words, any recoveries from lawsuits or the stock may also be used to collect interest on the administrative tax claim.

It is because of these provisions of the tax settlement that the United States continues to have an interest not only in the restitution claims (or judgments) to the extent unpaid, but also in the IMC stock or any valuable claims related thereto.  The United States has not nearly received

full payment of the tax incurred in the 1999 sale.  The principal alone was approximately $1,052,000.  The Receiver's total distributions to the United States thus far have come to $484,332, and a small additional amount is expected as a result of the final accounting. Accordingly, if there are valid claims in the "Amended Complaint," the United States wants them to be preserved if possible, and submits that this is both possible and lawful without having to keep the receivership case open.  The United States is not in a position to say with any certainty how probable it is that the Receiver will prevail if it is able to continue prosecuting the claims in the Amended Complaint, but the United States does not perceive the Amended Complaint as meritless on its face, and therefore does not want it dismissed with prejudice (and worries that even dismissal without prejudice at this juncture could effectively be prejudicial in light of any statutes of limitations that may have expired since the "Amended Complaint' was filed in 2006).

## II.  The Assignments to Sterling Are Lawful and Appropriate

Audax and CMA are simply wrong in arguing that it is flatly improper for a court-appointd receiver ever to take an assignment of any assets of a receivership estate because such constitutes improper self-dealing and a conflict of interest.  It is also questionable whether Audax and CMA even have standing to object, simply because they would prefer that a claim against them be extinguished forever.  That is, any improprieties are solely the concern of the claimants who have paid or been ordered to pay back 24.35% of their 1999/2000 distributions.  It is those claimants who would benefit if, for example, the causes of action against CMA and Audax were prosecuted by the Receiver as a fiduciary and resulted in fully paying all of the settled tax and administration claims and then some.

The assignments to Sterling (and the United States) proposed in the Termination Motion are proper because Sterling and its Counsel, by virtue of the prior tax settlement, have a lawful right to try to collect their administrative claims to the extent approved by the tax settlement

agreement that was approved by the Massachusetts District Court, and which also became the predicate for this Court's orders regarding restitution.  It is true that, in the event that the claims against CMA and/or Audax were to result in a recovery greater than needed to pay the remaining tax claim (37% of which was assigned to Sterling/F&W), as well as the litigation expenses incurred in prosecuting such claims against CMA and/or Audax, then the excess should be returned to those who actually paid restitution and/or be credited as reductions to the liability for restitution imposed on those who have failed to pay it.

The United States and the Receiver, however, were not focusing on the claims in the "Amended Complaint" and, in considering the value of the IMC stock apart from those claims, thought that the stock had no chance of selling for a sum greater than the balance of the unpaid administrative tax owed by the receivership estate, and that it was therefore unnecessary to address the contingency of a greater recovery in the Termination Motion.  Nevertheless, if such a large recovery came about after granting of the Termination Motion, we assure the Court that the United States would take the position that the receivership action must be reopened so that excess funds could be distributed to those who paid restitution.  The tax settlement agreement in fact expressly requires such refunds to restitution payors if the Receiver unexpectedly collected a large sum from another source.  That is now the solution we propose below in respect to the causes of action in the "Amended Complaint" – *i.e.*, that an order terminating the receivership and assigning to Sterling and the United States the IMC stock and claims related thereto include a condition that if collection of more than the total balance of the administrative tax claim with interest appears to become a reasonable possibility, the receiver shall move to reopen the receivership action.

But the notion that Sterling has to either keep the receivership estate open indefinitely (with the indulgence of this Court) or else forfeit its right to collect its administrative claims and those of its attorneys is untenable.  There is no impermissible self-dealing being proposed because the

Receiver already has a right under the prior orders in this case (specifically the one approving the tax settlement, which was approved only after notice to all claimants and an opportunity to object) to (1) 37% of any restitution amounts collected, and (2) 50% of any amounts recovered as a result of a sale of the IMC stock or net amounts recovered as a result of the prosecution of any claims related to the stock (together with litigation expenses including attorney's fees) at least until the full tax and interest is collected. There is no conflict of interest in permitting Sterling to prosecute any such claims because it would be doing so for the benefit, net of its litigation expenses, of the United States and itself in order to collect unpaid administrative claims of both combined. Moreover, under the tax settlement, once the full tax is collected with interest, Sterling would not be entitled to any additional administrative claims (again with the collections being net of future litigation expenses incurred in the prosecution of the claims related to the IMC stock).

The only conceivable conflict that could possibly arise, which is exceedingly remote, would be if Sterling accumulated evidence indicating a right to recover from CMA and/or Audax a sum in excess of the unpaid balance of the tax with all interest and Sterling settled for less simply because it no longer cared about recovering more than that sum (since it no longer had a fiduciary duty to the claimants to try to recover a sum that would enable it to return their restitution payments to them). Surely Audax and CMA should not be entitled to rest an objection to the proposed assignment of the causes of action against them on the thesis that CMA and Audax are liable to the receivership estate for such a large sum of money, while at the same time insisting that the Receiver's claims against them are meritless (which they would like the Court to believe is their belief).

The arguments of Audax are unavailing. The treatise it cites for the proposition that receivers "cannot accept shares of stock in exchange for advances to the corporation" refers to a receiver loaning money to a corporation in business or at least not yet liquidated. Here, that would

have meant IMMI, prior the sale of all of its assets in 1999.  Sterling here is not taking stock in the receivership entity; it is being assigned a half interest (with the United States) in stock in another entity that was part of the consideration received in exchange for its sale of the assets of the receivership entity.  Taking such third-party stock is no different than taking cash for its administrative claims, unless Audax or CMA wish to assert that the stock is worth more than the combined unpaid taxes and administrative claims of Sterling and F&W for compensation.  And, no purpose other than wasting expenses would be served by a stock valuation hearing (suggested by Audax) unless some party in interest seriously claims that the stock is worth so much that it would result in payment of more than the unpaid taxes and administrative claims of Sterling.

Audax argues that pursuit of the claims against it could lead to cross-claims.  Sterling appears to be keenly aware that it will have no immunity for its future acts, including its prosecution of any lawsuit(s).  That is not, however, a reason to refuse to discharge the Receiver.  If Audax or CMA have claims against Sterling now, they should be required to plead them forthwith or have them treated as waived.  If they plead such claims, the Receiver can then reconsider whether it still seeks termination or instead would prefer to litigate under the umbrella of immunity.  Audax's concerns about setoffs are immaterial as it will not lose any rights of setoff or recoupment – termination of the receivership and discharge of the Receiver do not eliminate defenses to any causes of action assigned to anyone.  The situation is no different than if the someone were now to come along and offer to buy the IMC stock along with any claims associated with it.  Audax could not be heard to argue in this Court that a Receiver may not sell assets of the estate to third parties, including causes of action.  Here, the assignment of the causes of action simply reflects a distribution on unpaid administrative claims, where the thing distributed clearly has less value than what the distributees (Sterling and the United States) are owed by the

receivership estate.[5]

### III.   Counsel for the United States Overlooked the Pending Show Cause Matter

The undersigned government attorney is the attorney who represented the United States in the Massachusetts proceedings, from the Northern Region Civil Trial Section of the Tax Division, Department of Justice.  When this case was re-transferred to Colorado, it was assigned to a Western Region trial section attorney.  That attorney is about to leave that office, and the undersigned has therefore recently applied for and been granted ECF registration by the Clerk of this Court.  The undersigned negotiated with the Receiver and its counsel the terms included in the Termination Motion for the assignments of the restitution claims and the IMC stock and any claims carried with that stock, consistent with the terms of the tax settlement in Massachusetts in respect to which the undersigned had been the government's chief negotiator.  The undersigned wishes to apologize to the Court because he completely forgot about the show cause proceeding pertaining to the "Amended Complaint" (as apparently did the Receiver and its counsel as well), or would have caused it to be addressed in the Termination Motion.  The undersigned incorrectly assumed that the proceedings against CMA and Audax had been dismissed without prejudice. (This also partly explains why the Termination Motion suggests that further prosecution of those claims might not be pursued by Sterling – *i.e.*, it was in view of potential statute-of-limitations issues, which now may be avoided if the Court follows the suggestion below.[6])

---

[5] Audax and CMA suggest that the Receiver is seeking exoneration for all past acts and claim that all that is proper is to "approve" the final accounts and "discharge" the receiver.  The United States takes no position on that issue, except that it expresses the view that any such exoneration would not be binding if a party brought to the Court's attention new evidence of an impropriety that had not been disclosed and specifically approved by the Court.

[6] This is not an attempt to impose a new duty on Sterling to pursue the causes of action past the point where it determines it is not in its own best interests to do so.  The intent of the tax settlement in this connection was plainly always to leave that determination to Sterling's business judgment, with the United States entitled to half of any net recovery.  This is in contrast to the restitution efforts that the tax settlement had clearly made a duty of the Receiver.

**IV.    Proposals for Resolving the Show Cause Matter and Allowing the "Amended Complaint" to Be Recognized as an Ancillary Complaint and Have It Be Given a New Cause Number**

For reasons essentially the same as those in the attached U.S. Show Cause Response, the United States respectfully submits that this Court should understand and treat the "Amended Complaint" as an Ancillary Complaint, assign it a new cause number, and terminate the receivership action with an express indication that the new action is assigned to the United States and the Sterling, to be prosecuted in the name of Sterling Consulting Corporation (deleting "as receiver for Indian Motorcycle Manufacturing Company, Inc." from the caption), subject to the condition that Sterling shall move to reopen the receivership case under Rule 60(b) in the unlikely event that discovery or other events cause it to perceive a substantial possibility of recovering more than enough to fully satisfy the administrative tax claim with all interest.[7]

As demonstrated in the attached U.S. Show Cause Response, ancillary complaints have historically been part of receivership actions. But the Receiver had been mistakenly dissuaded and discouraged from filing an "Ancillary Complaint" here, because there is no such item in the drop-down menu on the Court's ECF system and filing a separate action was not going to be treated as a related case and assigned to the judge presiding over the receivership action.  But surely this Court can direct the Clerk of this Court to take the pleading filed in this case as the "Amended Complaint" and upload it under a new cause number – whether beginning with "06" or "08" (or "09") if these issues are resolved after the new year, although we submit "06" would be preferable since it would more appropriately reflect the year in which the pleading was actually filed. Further, we submit that the complaint ought to be posted to the ECF docket with the date it was

---

[7] If the Court wished, it could also include a condition that any settlement be approved by the Court through a motion to reopen the receivership case to seek such approval.  We submit that the likelihood of abdication by Sterling in failing to take an opportunity to collect more than the tax plus interest is so remote that it is not necessary that this Court retain jurisdiction to approve a settlement.

originally filed in July of 2006, or else the Court should enter a separate order in the new case making it clear that the complaint will be treated, for statute of limitations purposes, as having been filed at that time.

Treating the "Amended Complaint" as an Ancillary Complaint and assigning of new cause number would of course be without prejudice to any and all defenses of CMA and/or Audax. We anticipate at least a possibility that Audax may argue that it is beyond this Court's *in personam* jurisdiction, although we suspect it has done business in Colorado. (For CMA, the settlement agreement between the Receiver and the Indian Entities stipulates to jurisdiction in this Court and is explicitly binding on assignees, and thus on CMA.) But even assuming Audax were to assert such a contention and prevail in that regard, it would then become appropriate, under 28 U.S.C. § 1631, to transfer the relevant portions of the complaint to a district of the Receiver's choosing where Audax would be subject to process, specifically to assure that a new statute of limitations defense is not created (which is the entire point of § 1631).

Treating the "Amended Complaint" as an Ancillary Complaint is not in any way inconsistent with terminating the receivership action, since the action would be assigned as part of the termination. This is analogous to bankruptcy cases in which bankruptcy courts routinely assign one case number to the "case" under title 11 (28 U.S.C. § 1334(a)) and then assign separate "adversary proceeding numbers" to proceedings that arising under title 11 or arising in or are related to a case under title 11 (28 U.S.C. § 1334(b)). It is not at all uncommon for a bankruptcy court to expressly retain jurisdiction over an adversary proceeding even when the underlying bankruptcy case is dismissed or otherwise closed. *See In re Hook*, 2008 WL 4424811, *2 (Colo. 2008); *Porges v. Gruntal & Co., Inc. (In re Porges)*, 44 F.3d 159 (2d Cir.1995); *In re Morris*, 950 F.2d 1531 (11th Cir. 1992); *In re Lake Tahoe Land Company*, 12 B.R. 479, 480-81 (Bankr. Nev. 1981). It is also not uncommon for there to be a plan of liquidation in a Chapter 11 case which

vests all of the debtor's rights, including causes of action, in a liquidating trust, that the liquidating trustee will then prosecute.  *E.g.*, *In re Refco, Inc. Securities Litigation*, 2008 WL 1827644 (S.D.N.Y. 2000); *In re Lisanti Foods, Inc.*, 329 B.R. 491 (D. N.J. 2005); *In re U.S. Wireless Corp.*, 333 B.R. 688 (Bankr. Del. 2005).  The trustee is thus not a bankruptcy trustee and the property is no longer property of a bankruptcy estate.  *See* 11 U.S.C. § 1141(b) (confirmation of plan vests property of the estate in the reorganized debtor or another entity).  Usually, the trustee of the liquidating trust is a lawyer for a large secured creditor or for an unsecured creditors committee whose members are the likely beneficiaries if the lawsuits are successful, and who is already familiar, due to involvement in the bankruptcy case, with the facts underlying the causes of action to be prosecuted.  If the Chapter 11 estate is administratively insolvent (as is true of the receivership estate in this case), the only probable beneficiaries of the liquidating trust may be administrative claimants, including professionals with claims for compensation arising from services to the debtor in possession during a failed reorganization effort.  In that event, there is no bar to one of those professionals being named the trustee of the liquidating trust.

Here, no state-law liquidating trust is needed because the United States and Sterling have instead agreed on an acceptable (and previously approved) sharing arrangement where Sterling may prosecute any actions related to the IMC stock, or sell the stock (with any causes of action associated with its ownership), and the United States will receive half the net proceeds, up to the point where IMMI's 1999-year income tax is fully satisfied with interest, while Sterling/F&W will receive the other half to compensate for services that went unpaid between 2002 and 2006 (after which they collected 37% of 95.53%, or about 35.34%, of amounts collected as restitution, which hardly paid them more than a reasonable collection fee carved out of the tax principal that the

government could recover through restitution).[8]  That arrangement is governed by a written agreement which is analogous to an instrument that might govern a liquidating trust that might be appropriate if there were more administrative creditors.  The additional complexity of a liquidating trust is not necessary here.

### Conclusion

The Court should grant the termination motion by entering an order similar to the one proposed by the Receiver ("Termination Order"), coupled with the following additional relief:

(1) the Court should first enter a separate order that the "Amended Complaint" filed in this cause on July 10, 2006, "shall be understood as an Ancillary Complaint and that the Clerk is directed to assign it a new cause number (if possible one reflecting its filing in 2006) and to docket it as filed July 10, 2006," or, if that is not possible, then the order should direct the Clerk also to docket the order in the new case and the Court should include in it a finding that the "Amended Complaint" document was filed on July 10, 2006, but misfiled in case number 05-cv-777;

(2) the Court should specify that the new cause of action is among the items being assigned to the United States and Sterling, consistent with the Termination Order; and

(3) the Court should include such conditions in the Termination Order as the Court deems appropriate to address the unlikely event that the new cause of action may result in a recovery

---

[8] Another administrative creditor was entitled 4.47% off the top and the government and Sterling/F&W split the rest 63/37 under the tax settlement.

exceeding the unpaid balance of the tax of IMMI incurred in the sale of the receivership estate assets in 1999, together with statutory interest.

Dated this 19th day of December, 2008.

Respectfully submitted,

TROY A. EID
United States Attorney

/s/ Peter Sklarew
PETER SKLAREW
Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55
Washington, D.C.  20044
Telephone: (202) 307-6571
Facsimile: (202) 514-5238
Email:  peter.a.sklarew@usdoj.gov

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that on this 19th day of December, 2008, I caused the foregoing **United States' Reply to Objections of Audax (DI# 2702) and CMA (DI# 2712) to Receiver's Motion to Terminate Receivership and Assign Remaining Claims to the United States and Sterling (DI# 2674)** to be filed electronically using the CM/ECF system, which will serve all counsel registered for service by that means.

/s/ Peter Sklarew
PETER SKLAREW
Attorney, Tax Division
U.S. Department of Justice